## Commonwealth *v.* Krutsick, Appellant.

Argued October 30, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Nathan Lavine,* with him *Martin H. Philip,* for appellant.

*Albert H. Heimbach,* District Attorney, for appellee.

OPINION BY KELLER, P. J., January 28, 1943:

This appeal raises two questions:

(1) Was it error for the court below to refuse to admit in evidence on the trial of an indictment for fornication and bastardy, a letter written on behalf of the defendant to the mother of the child, requesting her to submit herself and her child to a blood-grouping test, supervised by competent medical authorities, in an effort to determine that the defendant was not the father of the child, and her refusal to do so?

(2) Did the court err in refusing to permit a doctor called by the defendant to explain to the jury the use of blood-grouping tests and the extent to which they are used in the medical profession, for the purpose of determining that, in certain restricted situations, it is possible to tell with certainty that a person of a particular blood-group could not be the father of the child —in other words, that by said test parentage can *never be proved,* but that in certain cases it can be *disproved?*

The answer to both questions is, No.

We agree with the learned court below that the case is governed in principle by the decision of this court in *Com. v. English,* 123 Pa. Superior Ct. 161, 186 A. 298. We there held, in an opinion written by Judge PARKER, now a Justice of the Supreme Court, that the mother of a bastard child could not be required, on the motion of the putative father, to submit her-

self and her child to blood-grouping tests, and that the refusal of the court below to charge the jury that they could take into consideration the fact that the mother of the child had refused to consent to such test was not error.

The principal ground relied on by us in that case was that the proposed test is not the equivalent of an inspection of the body, but is a minor operation, involving the insertion of a needle in her body and that of her child and the taking from each of them of a small quantity of blood for microscopic examination, testing, and grouping, pursuant to certain complex biological processes[1]; and while the "operation is not regarded as entailing any serious danger to the health of the patient it cannot be said that there is no danger for there is always present some risk of infection."[2] Certainly, such a thing done forcibly, against her will, would be a serious assault and battery.

But we also pointed out, what is admitted in the second question involved, as above stated, that while the test, in a very limited proportion of cases, might prove that the defendant was not the father of the child, it could never be of any probative force to show that he was the father. Professor Wigmore, says on this point (p. 619): "To sum up, in the case of certain progeny-types, this *negative proof,* amounting to conclusive demonstration of *non-paternity* is feasible. But *affirmative proof* of *paternity* is not feasible by the methods above described; nor is the blood-type-evidence in such cases even a probable indication (except in the rare theoretical case above noted par. II, 4), and there-

---

[1] Professor Wigmore in the third edition of his work on Evidence, Vol. I, section 165(b), pp. 614-622, gives a rather full and detailed account of the complex biological processes involved in the test.

[2] See *Henderson v. National Drug Co. & Grahn* 343 Pa. 601, 23 A. 2d 743.

fore should not be used in judicial proceedings". And advocates of the compulsory use of such tests would restrict their use to cases where they showed the *impossibility* of paternity.[3]

In such case the putative father would have everything to gain and nothing to lose by the test, while the mother would have everything to lose and nothing to gain by it. The man's 'pitch' or 'throw' would always be "Heads *I* win and tails *you* lose."

As the probabilities of proving non-paternity vary from one in seventeen for blood-group A—which represents approximately 42% of the men in the United States—to one in five for blood-group O, which represents 45%, and one in seven for blood-group B, which represents 10%, and one in two for blood-group AB, which represents only 3%,[4] it can readily be seen that there is no reliable standard for determining the probability of proving *non-paternity* unless the man's blood-

---

[3] See William Louis Flacks in American Bar Association Journal, Vol. XXI, p. 680, 682: "Consequently it is apparent that when the blood tests show the impossibility of paternity, the alleged father may avail himself of such evidence; while if the blood tests merely indicate a possibility of paternity the chances require that it be excluded for lack of any real probative value as compared to its highly prejudicial effect on the accused. However, the latter consideration remains as a problem for the courts to work out as they become accustomed to the application of such tests. The New York statute will cause no little trouble on this score due to its broad language. While it clearly paves the way for the admission of the results where favorable to the defendant it similarly permits admission of results adverse to him. It would seem that it should be held non-applicable in the latter instance notwithstanding he had requested the test originally as he is given the right to do. Since it is only a matter of chance whether it will prove adversely or otherwise, to permit any and all results of blood tests to go before the jury will destroy the value and benefit of the act and prevent actually innocent parties from seeking the protection of the test."

[4] I Wigmore sec. 165(b), p 622.

group is known, and then as to 97 per cent the probabilities would vary from 6 per cent in A, to 14 per cent in B, and 20 per cent in O, and would be of no probative value whatever in the remaining 94% for A, 86% for B, and 80% for O.

A general percentage calculated on constituent *percentages* would, of course, be mathematically incorrect.

No court would think of admitting finger prints in evidence to convict or acquit a defendant, if the probability of their being of probative effect was only one in seventeen, or one in seven or one in five, or anything short of one hundred per cent; nor would photographs or other such forms of evidence be admitted unless they presented an exact likeness of the object rather than only a slight degree of similarity to it.

Professor Wigmore says (p. 612), "The progress of science will no doubt make it possible from time to time to increase the range of the cases that afford decisive proof, both negative and affirmative." It was this thought that we had in mind when we said in the English case (p. 169): "Until the legislature finds that blood-grouping tests have attained such scientific standing as to possess probative value as to *paternity* [and not merely non-paternity] and that the ends of justice require action by it, and the legislature acts, the courts have not the power in a criminal case such as this to compel a prosecutrix or other witness to submit her body for blood tests." (Italics supplied).[5]

It follows, as a corollary, that until such blood-grouping tests have, through the progress of science, been so perfected as to afford decisive proof, negative and

---

[5] See Act of June 24, 1939, P. L. 808, for the prevention of congenital syphilis, which provides for the taking of a sample of blood by every physician who attends any woman pregnant with child, *"if no specific objection thereto is made by such woman."*

affirmative, as to paternity, the refusal of a witness to submit her body and that of her child to blood tests, should not operate against her or be received in evidence as weakening the credibility of her testimony.

The assignments of error are overruled and the judgment is affirmed; and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be committed by that court until he has complied with the sentence, or such part thereof as had not been performed when the appeal was made a supersedeas.