## Commonwealth ex rel. O'Brien *v.* O'Brien, Appellant.

552

Argued May 29, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Irving R. Shull,* with him *Alfred I. Ginsburg* and *Bernard L. Lemisch,* for appellant.

*Norman R. Bradley,* for appellee.

OPINION BY MR. JUSTICE COHEN, November 18, 1957:

We have allowed this appeal from a judgment of the Superior Court in order that we might determine whether, in an action for the support of a minor child, born during wedlock, a husband may obtain compulsory blood grouping tests in order to exclude himself from being the father of the child.

The present proceedings were instituted by the relatrix in 1954 in order to increase the amount of a support order entered in favor of herself and a daughter,

and to include therein a son born before her divorce.[1] At the hearing before the Domestic Relations Division of the Municipal Court of Philadelphia, the former husband moved for compulsory blood grouping tests of his wife, the son, and himself under the Act of 1951, providing, *inter alia*: "In any proceeding to establish paternity, the court, on motion of the defendant, shall order the mother, her child and the defendant to submit to one or more blood grouping tests . . . to determine whether or not the defendant can be excluded as being the father of the child. . . ." Act of May 24, 1951, P. L. 402, §1, 28 P.S. §306 (Supp).

The Municipal Court denied the motion, entered an order for the support of the son, and increased the weekly payments. On appeal the Superior Court affirmed, with three judges dissenting.[2]

We are not here called upon to decide the general question of the admissibility of, or the probative weight to be accorded to, blood grouping tests offered in evidence. Nor are we required to determine the specific issue of whether a trial court might in the exercise of its discretion refuse to proceed in an action for support until the relatrix consents to undergo such an examination.

The sole question before us is whether in an action for support a husband may obtain, as a statutory right, compulsory blood grouping tests of the mother and her child born during wedlock.

At the outset we note that the legislature placed two qualifications upon the right to compulsory blood

---

[1] The support proceedings were instituted under the provisions of the Act of June 24, 1939, P. L. 872, §733, as amended, 18 P.S. §4733 (Supp).

[2] The majority and dissenting opinions are reported in 182 Pa. Superior Ct. 584, 128 A. 2d 164 (1956).

grouping tests which substantially limit the scope and application of the act: 1. Only a male defendant who is the putative father may move to have the blood grouping tests taken. 2. Such tests are permitted only in "proceedings to establish paternity."

These qualifications render the statutory procedure unavailable, among others, to the following parties who might seek blood grouping tests to negate paternity: husbands bringing an action for divorce on the ground of adultery,[3] or an action for annulment because of fraudulent representations as to parenthood;[4] mothers seeking custody of children;[5] parties seeking a determination that they are the parents of a child of whom another claims to be the father;[6] parties disputing the claim of a child to share in an estate;[7] parties attempting to prove non-citizenship of a child;[8] or to defendants in prosecutions for rape in which the prosecuting witness testified that as a consequence of the rape she became pregnant and gave birth to a child.[9]

On the other hand, the act does apply to at least two classes of cases—prosecutions for fornication and bastardy, Act of June 24, 1939, P. L. 872, §506, as amended, 18 P.S. §4506 (Supp.), and actions for neglect to support a bastard, Act of June 24, 1939, P. L. 872, §732, 18 P.S. §4732. Thus, apparently the act was designed to aid the man who is accused by an unwed mother of being the father of her illegitimate child. Except for protestations of innocence, a blameless de-

---

[3] See *C. v. C.*, 109 N. Y. S. 2d 276 (1951).

[4] See *Cuneo v. Cuneo*, 96 N. Y. S. 2d 899 (1950).

[5] See *Groulx v. Groulx*, 98 N. H. 481, 103 A. 2d 188 (1954).

[6] See *Scalone v. Scalone*, 98 N. Y. S. 2d 167 (1950).

[7] See *Baker v. Weiss*, 43 D. & C. 707 (1941) ; *Spencer v. Spencer*, 47 D. & C. 192 (1942).

[8] See *Lue Chow Kon v. Brownell*, 220 F. 2d 187 (2nd Cir. 1955).

[9] See *State v. Eli*, 62 N.W. 2d 469 (N. D. 1954).

fendant is often helpless to refute such a charge lodged against him, and consequently is convicted of the crime. In addition to being compelled to support a child which he has not fathered, the defendant also receives the condemnation of the community. The legislature apparently believed that the occasions of injustice in these two classes of cases were so numerous as to overcome any reluctance to compel a complaining witness to submit her body to blood tests at the option of a defendant, and therefore provided this procedure whereby a defendant might successfully assert his innocence.

The husband herein, however, contends that this action for support of a child born during wedlock is also a "proceeding to establish paternity" within the meaning of the act's second qualification.[10]

We cannot agree. It is true that the present proceeding is one in which paternity is *relevant* or one in which paternity has been *controverted,* or one in which paternity is an *issue,* but it is not a proceeding brought to *establish* paternity. In actions brought by a wife against a husband for support of a minor child born during wedlock, paternity has already been established in the eyes of the law by operation of the presumption of the legitimacy of children born during wedlock. *Cairgle v. American Radiator & Std. San. Corp.,* 366 Pa. 249, 255-56, 77 A. 2d 439 (1951). The presumption of legitimacy is invoked at the very moment of birth and no further proceedings are required to establish the paternity of the child.[11] This presump-

---

[10] Even though the defendant is technically a "respondent" in the present proceeding, we will not question that he has satisfied the first requirement of the act, *i.e.,* that he is a male defendant who is the putative father.

[11] Cf. *Hill v. Johnson,* 102 Cal. App. 2d 94, 226 P. 2d 655 (1951). But cf. Annotations, 46 A.L.R. 2d §§14(d), 15(c) (1956).

tion is essential in any society in which the family is the fundamental unit.

The result urged upon us by the appellant has been reached in other jurisdictions through the interpretation of statutes containing a broader provision for blood group testing than that set forth in our own act.[12]

Several legislatures have seen fit to make blood tests available in any *civil or criminal action* in which paternity is a *relevant fact*. This is the provision of the Uniform Act on blood tests to determine paternity.[13] New Jersey permits blood tests: "Whenever it is *relevant to the case of the prosecution or the defense* in a *proceeding involving parentage of a child,*" and "Whenever it shall be *relevant in a civil action* to determine the parentage or identity of any child. . . ."[14] And the language of the statute adopted by New York reads: "Wherever it shall be relevant to the *prosecution or defense* of an action, or *wherever it shall be relevant in any proceeding* pending in a court of record jurisdiction. . . ."[15] Even the Pennsylvania legislature employed terms of wider application when it made birth certificates *prima facie* evidence of their contents in *proceedings in which "paternity is controverted."*[16] The fact that our own legislature declined

---

[12] *Houston v. Houston,* 99 N. Y. S. 2d 199 (1955); *Cortese v. Cortese,* 10 N. J. Super. 152, 76 A. 2d 717 (1950); cf. *State by Dolloff v. Sargent,* 100 N. H. 29, 118 A. 2d 596 (1955).

[13] National Conference of Commissioners on Uniform State Laws, 1952, 9 U.L.A. 19-22 (Supp). (Emphasis supplied) Among the states which have adopted the Uniform Act are: California, Michigan (with amendments), New Hampshire, Oregon, Utah (with amendments).

[14] Act of 1939, C. 221, §§1, 2, 2A N. J. Stat. Ann. §§83-2, 83-3. (Emphasis supplied).

[15] Act of March 22, 1935, Ch. 196, as amended, Cahill-Parsons N. Y. Civ. Prac. Act, §306-A (2nd ed. 1955). (Emphasis supplied)

[16] Act of June 29, 1953, P. L. 304, §810, 35 P.S. 450.810 (Supp). It is interesting to note that in this statute the legislature stipu-

to choose any one of these provisions of more liberal scope when it enacted the present compulsory blood test statute indicates that it did not intend to extend the application of the act beyond the two proceedings—prosecutions for fornication and bastardy and actions for neglect to support a bastard—the abuses of which were the motivating forces behind passage of the legislation.[17]

---

lated that this presumption should not apply to a "proceeding in which paternity is controverted . . . *unless the alleged father is the husband of the mother of the child.*" Act of June 29, 1953, P. L. 304, §810, 35 P.S. 450.810 (Supp). (Emphasis supplied).

[17] In *Commonwealth v. Stappen*, 143 N.E. 2d 221 (Mass. 1957), the Supreme Judicial Court of Massachusetts was asked to decide whether the Massachusetts compulsory blood grouping test statute was applicable to proceedings brought for nonsupport of minor children born during wedlock. The Massachusetts Act, G. L. (Ter. Ed.) c. 273, §12A, provides inter alia: "*In any proceeding to determine the question of paternity,* the court, on motion of the defendant, shall order the mother, her child and the defendant to submit to one or more blood grouping tests, to be made by a duly qualified physician or other duly qualified person, designated by the court, to determine whether or not the defendant can be excluded as being the father of the child." (Emphasis supplied).

The Court held: "As the present indictment is not a 'proceeding to determine the question of paternity,' §12A does not in our opinion authorize the court to order the mother and children therein named to submit to a blood grouping test. The language of §12A is the same (sic) as that employed in Title 28 Purdon's Pennsylvania Statutes, §306, inserted by a statute enacted in 1951. The matter of blood grouping tests on order of the court appears to have been first presented to the Massachusetts Legislature in the form of a proposed bill (1954 House Doc. No. 666) which, following the language of Ohio Rev. Code, §2317.47, provided that the court order submission to a blood grouping test 'Whenever it shall be relevant in a civil or criminal action or proceeding to determine the paternity or identity of any person . . . .' It is significant, and persuasive of the correctness of our construction of the statute, that in the final draft of the proposed bill (1954 House Doc. No. 2495) and in the statute as enacted the language of the Pennsylvania

We hold, therefore, that the present proceeding is not a "proceeding to establish paternity" within the intendment of the Act of May 24, 1951, and that the defendant herein was not entitled to have compulsory blood grouping tests taken of his former wife and their child.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE CHIDSEY:

The majority opinion makes it quite clear that it is not concerned with the question of "the admissibility of, or the probative weight to be accorded to, blood grouping tests offered in evidence." Indeed, the question of admissibility is not an open one in Pennsylvania. The introduction and probative value of blood grouping tests in various proceedings has been judicially recognized in this Commonwealth since 1931, and has since received almost universal acceptance in the courts of the nation as an extremely valuable aid in the determination of truth in judicial proceedings. "The sole question", in the majority view, is whether "a husband may obtain, as a statutory right, compulsory blood grouping tests of the mother and her child born during wedlock."

By virtually limiting the Act of 1951 to prosecutions for fornication and bastardy and to actions for neglect to support a bastard, the majority does not eliminate the use of blood grouping tests in actions such as the instant one, but simply restricts the ability of a defendant to have a court order the taking of such

statute was adopted in preference to that of the Ohio code. This Pennsylvania statute has been construed in that Commonwealth to be inapplicable in a proceeding similar to that in the present case. Commonwealth v. Heydt, 3 Pa. Dist. & Co. R. 2d, Pa., 129, 130."

tests, admittedly relevant if the results are otherwise obtained.[1] Thus the ultimate effect of the majority opinion in the instant class of cases is to prohibit the taking of blood grouping tests under the impartial direction and scrutiny of a trial court, but to permit the admission of such test results should the defendant be fortunate enough to have secured the necessary blood types from tests made under other circumstances. This anomalous result is one which I submit the Legislature never intended when it enacted a statute clearly designed to aid defendants and expand the judicial use of conclusive scientific evidence by requiring a trial court to order blood grouping tests upon motion of the defendant "In *any* proceeding to establish paternity . . .".

From a policy viewpoint, the basic reason advanced by the majority for so limiting the use of blood grouping tests is that "paternity has already been *established* in the eyes of the law by the operation of the *presumption* of legitimacy of children born during wedlock. Cairgle v. American Radiator & Std. San. Corp., 366 Pa. 249, 255-56, 77 A. 2d 439 (1951)." (Emphasis supplied). To hold that a "presumption" *establishes* a fact "in the eyes of the law" is not only to look upon justice as blindfolded, but to blind her by the law's own hand. The very nature of a "presumption" is to permit it to be rebutted by clear evidence to the contrary, and no evidence known to the judicial process is more lucid and scientifically certain than the blood grouping test when used to negative paternity.

That the presumption of legitimacy may be overcome by countervailing evidence is clearly demonstrat-

---

[1] It is not uncommon today for blood types to be recorded for most persons undergoing hospitalization, for blood donors, at birth, upon induction into the armed forces, and by the American Red Cross or other relief or defense organizations.

ed by the *Cairgle* case, supra, cited by the majority. Mrs. Cairgle had been living apart from her husband since 1932, and continuously with another man since 1936. In 1939, 1942 and 1943 children were born to her which she surnamed after the man with whom she was then living. Subsequent to the husband's death in 1948, she filed an amended claim with the Workmen's Compensation Board for compensation for the three minor children as the legitimate children of Cairgle. She and some of her adult children testified that Cairgle had access to her during the time the minor children were born. The woman living with Cairgle from 1939 on denied this. The referee and the board disbelieved Mrs. Cairgle's testimony in this regard. This Court pointed out, at p. 255, that: ". . . The old rule, that the presumption of legitimacy could not be overcome by any proof less than the absence of the husband beyond the seas immediately prior to and during the whole period of gestation, was so contrary to human experience that it was abandoned in Pennsylvania as early as 1814: . . .", and although the evidence to rebut the presumption of legitimacy must still be "clear, direct convincing and unanswerable", p. 256, it was concluded that the facts taken as a whole were sufficient to rebut the presumption. This presumption, which can be traced to Roman Law, was rebuttable even in the early common law by proof that the husband was beyond the King's realm or by proving the husband's impotence, and the presumption was further modified at an early date. As pointed out by Chief Justice TILGHMAN in *Commonwealth v. Shepherd*, 6 Binney 283, 286 (1814) : ". . . In old times it seems to have been holden, that a child born of a married woman, whose husband was within the four seas which bounded the kingdom, could not be considered as illegitimate. This was unreasonable. When the husband

has access to his wife, it is right that no evidence, short of absolute impotence of the husband, should bastardize the issue. But where they live at a distance from each other, so that access is very improbable, the legitimacy of the child should be decided upon a consideration of all circumstances. The law was so laid down in Pendrell v. Pendrell in the fifth year of George the second, 2 Stra. 925, and has ever since been considered as settled."

The test for rebutting the presumption of legitimacy affirmed by the *Cairgle* case is that the evidence be "clear, direct, convincing and unanswerable". It is to be reiterated that no test known to the law more adequately meets these requirements than the blood grouping tests with which this case is concerned. Testimony by witnesses as to access is always subject to close scrutiny because of the witness's interest and the fallibility of human observation. Even medical testimony as to impotency is often a matter of medical opinion; learned, but nonetheless opinion. These tests (and the Act provides for one or more, in case there is any question as to the validity of the results) are impartial, perfected to the limits of modern science, and unquestionable when used to prove nonpaternity.

The ultimate vice of the majority opinion is not merely the improper use of a "presumption" as a substitute for fact, but the use of the presumption at all in regard to the question at bar. Were admissibility in issue, then the social considerations inherent in the presumption of legitimacy, such as the sanctity of the family relationship and the social consequences of bastardization, might come into play.[2] But the majority

---

[2] It may be observed that the sanctity of the family relationship has inevitably been destroyed prior to the institution of suit where the husband-defendant has denied paternity. Whatever so-

makes clear that admissibility is not now before the Court. The only question is whether the Legislature intended to narrowly limit the grant to defendants of a judicial means of acquiring clearly admissible and relevant evidence, to only one class of defendants (those who have purportedly fathered a child out of wedlock), or whether in view of the broad language employed, a wider application was intended.

The blood grouping tests used in paternity cases are based on the scientific principle, nowhere seriously disputed today, that certain components of the blood may be transmitted to an offspring only from its parents. Thus if a child's blood contains a particular blood characteristic not contained in the mother's blood, then either the purported father must have the blood characteristic being tested for in his blood-stream, or he could not possibly have fathered the child.[3] Since maternity is rarely in issue, the blood grouping test has been found of inestimable value in excluding purported fathers from the liabilities of unwarranted legal parenthood. The tests have not been found of probative value to affirmatively show paternity because of the large class of possible fathers in each blood group. Their use in paternity cases, therefore, has been largely confined to negativing paternity, and the Act before us conforms to the prevailing usage in this regard. Thus if a defendant is unjustly accused of being the father of a child, he has a reasonably good chance of clearing himself via these blood tests, and as science

cial consequences arise out of bastardy and infidelity have been visited upon the family involved long before the courtroom issue of admissibility of evidence arises.

[3] A simplified explanation of the scientific basis of blood grouping tests appears at 163 A.L.R. 941; and see 1 Wigmore, Evidence, 3d Ed. §165A, §165B, wherein is noted an extensive collection of articles on the subject.

increases the number of reliable tests, so will the defendant's chances of thereby proving nonpaternity. It is undisputed that, if the tests are properly administered, a defendant who is excluded thereby could not possibly have been the father of the offspring in question.

The first reported American case to recognize the efficacy of these tests was *Commonwealth v. Zammarelli*, 17 D. & C. 229 (1931), in which a conviction for fornication and bastardy was set aside and a new trial granted, where the uncontradicted testimony of a doctor, who had taken blood tests of the parties, was that the mother had blood type A and the child had type B, and that the defendant, who had blood type O, could not possibly have been the father of the child.

In *Commonwealth ex rel. v. Visocki*, 23 D. & C. 103 (1935), an action was brought against the prosecutrix's husband for support of a *child born in wedlock* shortly after her marriage to him. The defendant introduced the testimony of two physicians who had taken blood samples from the parties, and who testified that as a result thereof the defendant could not possibly have been the father of the child. The court found that the scientific proof was sufficient to overcome the presumption of legitimacy, and dismissed the case.

Again in *Baker et al. v. Weiss et al.*, 43 D. & C. 707, 52 Dauph. 50 (1941), and *Spencer, etc. v. Spencer et al.*, 47 D. & C. 192, 53 Dauph. 241 (1942), (both aspects of the same case), evidence of blood tests to which the parents had voluntarily submitted was held admissible to prove the illegitimacy of a *child born in wedlock* in a declaratory judgment action and in a proceeding to perpetuate testimony.

*Commonwealth v. Morris*, 22 D. & C. 111 (1934), presented the question of whether the prosecutrix in

a fornication and bastardy proceeding could be compelled to submit to a blood test. The court reasoned that if this were a civil proceeding it might refuse to proceed unless the plaintiff subjected herself to a blood test, but, absent legislative authority to compel the prosecutrix to undergo a blood grouping test, the court could not refuse to allow trial of a criminal action in which the Commonwealth, not the prosecutrix, was the plaintiff.

This was precisely the position taken by the Superior Court in *Commonwealth v. English,* 123 Pa. Superior Ct. 161 (1936), 186 A. 298, and reiterated in *Commonwealth v. Krutsick,* 151 Pa. Superior Ct. 164 (1943), 30 A. 2d 325. As Judge PARKER said in the *English* case at p. 169: "As we have seen, it is a well settled principle that even a party may not be compelled forcibly to submit his body for tests, but the court may refuse to permit a case to proceed until such party undergoes an examination. We are here concerned not with a civil but a criminal case in which the commonwealth is the plaintiff. To refuse to allow a criminal case to proceed until a recalcitrant witness submits to an examination would deprive the commonwealth of its right and duty to enforce its criminal laws. In addition the granting of the prayer of the petition would result in more than a mere permission to inspect the body of the prosecutrix for it is proposed to insert a needle in her body and withdraw a small amount of blood for an examination. While, as we have indicated, such an operation is not regarded as entailing any serious danger to the health of the patient, it cannot be said that there is no danger for there is always present some risk of infection. Until the legislature finds that blood grouping tests have attained such scientific standing as to possess probative value as to paternity and that the ends of justice re-

quire action by it, *and the legislature acts,* the courts have not the power in a criminal case such as this to compel a prosecutrix or other witness to submit her body for blood tests.". (Emphasis supplied.)

As to the value of the tests as evidence, however, there was no question. By the time our Legislature had the Act of May 24, 1951 before it, California, the District of Columbia, Maine, New Jersey, New York, Ohio, South Dakota and Wisconsin[4] had already followed the lead of *Commonwealth v. Zammarelli,* supra, either by statute or judicial fiat, and had affirmed the judicial use of blood grouping tests to ascertain paternity. It may also be noted that by 1951 our Superior Court in *Commonwealth v. Statti,* 166 Pa. Superior Ct. 577 (1950), 73 A. 2d 688, as well as the Federal Courts, and the Courts of California, Florida, Maryland and Missouri[5] had recognized the use of blood grouping tests for identification purposes in various criminal cases.

It is in light of this widespread acceptance of the validity and use of blood grouping tests throughout the nation that the Act of May 24, 1951 must be viewed. Reported cases within this Commonwealth had admitted blood grouping tests in a fornication and bas-

---

[4] *Berry v. Chaplin,* 74 Cal. App. 2d 652, 169 P. 2d 442 (1946); *Beach v. Beach,* 72 App. D. C. 318, 114 F. 2d 479 (1940); *Jordan v. Davis,* 143 Me. 185, 57 A. 2d 209; Maine Laws, 1949, c. 153, Sec. 34; N.J.S.A.R.S. 299-3, -4 (1950); N. Y. Civ. Prac. Act, Sec. 306-a (1939); Ohio Gen. Code Supp., 1949, Sec. 12122-1, -2; *State v. Clark,* 144 Ohio St. 305, 58 N.E. 2d 773; *State v. Damm,* 64 S. D. 309, 266 N.W. 667 (1936); *Euclide v. State,* 231 Wisc. 616, 286 N.W. 3 (1939).

[5] *Kemp v. Government of Canal Zone,* 167 F. 2d 938 (1948); *People v. Mummert,* 57 Cal. App. 2d 849, 135 P. 2d 665 (1943); *Williams v. State,* 143 Fla. 826, 197 So. 562 (1940); *Shanks v. State,* 185 Md. 437, 45 A. 2d 85, 163 A.L.R. 931 (1945); *State v. Cole,* 354 Mo. 181, 188 S.W. 2d 43, 189 S.W. 2d 541 (1945).

tardy proceeding,[6] in a support proceeding where the child had been born in wedlock,[7] and in a declaratory judgment action in which a child born in wedlock was declared a bastard.[8] In three other Pennsylvania decisions[9] the validity of blood grouping tests was apparently conceded, but the courts declared themselves powerless to compel the taking of such tests, without legislative action in this regard. Several sister States had already adopted legislation to overcome this obstacle.[10] The National Conference of Commissioners on Uniform State Laws was at the time drafting and considering the Uniform Act on Blood Tests to Determine Paternity, which it was to approve in 1952.

With this background, I do not think the majority is justified in taking the words "In any proceeding to establish paternity, . . ." and construing the legislative intent in the narrowest possible fashion. The majority would apply the Act in question to a prosecution for fornication and bastardy under Section 506 of The Penal Code, Act of June 24, 1939, P. L. 872, as amended, and to an action for neglect to support a bastard, Section 732 of The Penal Code, but not to an action for desertion and nonsupport in the immediately succeeding Section 733 of that same Penal Code. It would impute to the Legislature an intent to unreasonably and invidiously afford a defense to one defendant and

---

[6] *Commonwealth v. Zammerelli*, supra.

[7] *Commonwealth ex rel. v. Visocki*, supra.

[8] *Baker et al. v. Weiss et al.*, supra, and *Spencer, etc. v. Spencer et al.*, supra.

[9] *Commonwealth v. Morris, Commonwealth v. English* and *Commonwealth v. Krutsick*, all supra.

[10] Maine Laws, 1949, c. 153, Sec. 34; Md. Ann. Code, art. 12, Sec. 17 (Flack, Supp. 1943); N. J. S.A.R.S. 229-3, -4 (1950); N. Y. Civ. Prac. Act, Sec. 306-a (1939); Ohio Gen. Code, Supp., 1949, Sec. 12122-1, -2; Wisc. Stats., c. 166.105 (1949).

deny it to another similarly situated, although conviction visits the same dire results upon both. It would hold that only the former two are "proceedings to establish paternity" [sic], and that these words of the statute are too narrow and exacting to encompass the latter proceeding, although the opinion states: ". . . It is true that the present proceeding is one in which paternity is *relevant* or one in which paternity has been *controverted,* or one in which paternity is an *issue,* but it is not a proceeding brought to *establish* paternity. . . .".

This would appear to be a classic case of a "distinction without a difference". Strictly speaking there is no "proceeding" in this Commonwealth "to *establish* paternity", unless it may be said that a declaratory judgment or an adoption proceeding might have this effect. Paternity is "established" by a physical act according to the laws of nature, not by a judicial "proceeding" under the laws of this Commonwealth. There are many proceedings in which it is important to prove that one is in fact the father of a child, or that one is the child of a certain father, and for the purposes of that particular suit it may be found that the fact of paternity is "established", but these are actions for support, criminal prosecutions, will contests, etc., not "proceedings to establish paternity". The action for neglect to support a bastard child makes parentage pertinent to the inquiry in these words: "Whoever, being a parent, wilfully neglects or refuses . . . to . . . support . . .". The action for desertion and nonsupport says: "If any . . . father . . . separates himself . . . or neglects to maintain . . .". In either case a man must be shown to be the father of the child before liability for its support will attach. In both cases "paternity is *relevant*", and where "*uncontroverted*", it is an "*issue*" to be determined at trial. It is true that in the

latter case the presumption[11] of legitimacy may aid the Commonwealth in its case, but this presumption may be overcome by the defendant (and often is), and where controverted it becomes an issue for the trier of fact, just as it is in the former cases admittedly within the Act, according to the majority. In both proceedings paternity must be "established".

In this perspective it seems clear that the Legislature intended that the Act of May 24, 1951 be used so as to make blood grouping tests more readily available as a means for obtaining truth in cases where paternity was relevant. To this end it used the broadest possible term when it opened the statute with the words "In *any* proceeding". "A more comprehensive word than 'any' could hardly be employed. It means indiscriminate, or without limitation or restriction. . . .", *Commonwealth v. One 1939 Cadillac Sedan et al.,* 158 Pa. Superior Ct. 392, 396, 45 A. 2d 406. The majority seems to ignore this term and takes the view: "At the outset we note that the legislature placed two qualifications upon the right to compulsory blood grouping tests which substantially limit the scope and application of the act:. . .". It comes to the conclusion that the application of the Act is substantially proscribed because the statute is limited to "proceedings to establish paternity", and because only the "male defendant who is the putative father may move to have blood grouping tests taken.".

These are not terms of restriction, but rather are definitive in nature. Blood grouping tests are in com-

---

[11] It may be noted that in the fornication and bastardy statute (admittedly within the Act of May 24, 1951, according to the majority) the following language, akin to a presumption, appears: "Any man charged by an unmarried woman with being the father of her bastard child, shall be the reputed father . . .".

mon usage in two broad classes of cases: (1) blood sample identification situations, as where in criminal cases a sample of blood found at the scene of a crime, or on some clothing, or in a car is matched with the blood of a victim or a defendant; and (2) cases where paternity is in issue, in which case the general usage allows introduction of blood grouping tests to show nonpaternity. In the former class, the *Statti* decision, 166 Pa. Superior Ct. 577, supra, affirmed the admissibility of the tests, and allowed that even a defendant in a criminal case could be required to submit several drops of his blood for use in blood grouping tests. At the time the 1951 Act in question was before the General Assembly no legislation was needed in that regard; while in the paternity class, the Superior Court had twice ruled the courts powerless to compel blood grouping tests in such cases. It was in this paternity class that remedial legislation was in order, and in this class that the General Assembly acted.

As to the "male defendant who is the putative father" qualification, to whom else would the majority have the Legislature apply the Act? The blood grouping tests, it must be remembered, are generally admissible in paternity cases *only to prove non-parentage*. Maternity, by virtue of the simple physical facts, is almost never in question; it is as to paternity that doubt may arise. If maternity were in question in any case, these tests would be almost totally useless because the identity of at least one of the parents must be certain in order to make the tests usable, and the identity of the father is invariably more questionable than that of the mother. Therefore, the admissibility of blood grouping tests in regard to parentage is limited to tests which negative paternity.

In an effort to show that the Legislature intended a restrictive application of the statute in question, the

majority points to seven classes of cases to which the statute is by its terms inapplicable. In not one of the first six examples cited[12] is there a male defendant interested in proving his nonpaternity. Obviously an Act granting a power to "the defendant" to determine whether he "can be excluded as being the father of the child" does not apply to cases where there is no defendant who is trying to so prove. What persuasive effect these six illustrations have in the instant case where a defendant *is* trying to prove his nonpaternity is beyond this opinion-writer's comprehension. If the six illustrations are cited merely to show that there are instances where this, or any statute for that matter, does not apply, then the examples may be multiplied ad infinitum. But certainly it does not persuade that a statute designed to aid defendants in establishing their nonpaternity "In any proceeding . . .", should be inapplicable to the case at bar where a defendant is asking the means wherewith he may prove his nonpaternity.

The harshness and unreasonableness of the majority result becomes all too clear in its citation, as the seventh example of instances in which it would hold blood grouping tests unavailable to a defendant under our

---

[12] It may be noted that each of the illustrative cases cited by the majority in this connection were cases wherein the jurisdiction involved (including Pennsylvania in the cited *Baker v. Weiss* and *Spencer v. Spencer* decisions) permitted the blood grouping test to be used. And our discussion of *English*, *Krutsick* and *Morris* cases, supra, makes clear that in many civil cases in this Commonwealth, including several of those cited in illustration, a trial court may require the contestants or litigants to agree to a blood grouping test, or else refuse to proceed, thus generally encouraging a recalcitrant party in interest to submit to a blood grouping test without benefit of statute. This "judicial urging" certainly makes the statute unnecessary when the recalcitrant party is a plaintiff in a civil action or a contestant in a will or intestacy proceeding.

statute, the case of a defendant in a prosecution "for rape in which the prosecuting witness testified that as a consequence of the rape she became pregnant and gave birth to a child", citing *State v. Eli*, 62 N.W. 2d 469 (1954 N.D.). A more startling example of the unfairness of the majority result could hardly be imagined. To deny to the defendant, who upon conviction may be subject to a sentence of fifteen years in the penitentiary, the use of a test which might convincingly prove his innocence, is antithetical to any concept of judicial encouragement of the use of the most reliable evidence available.

But even that last example is not the case at bar, and we need not go so far. Here the majority cites a series of clearly inapposite illustrations to support its contention that a statute which says absolutely nothing about wedlock or bastardy or legitimacy or unwed mothers or unfaithful wives was intended by our Legislature (when it used the words *"In any proceeding . . ."*) to distinguish between the privileges afforded a defendant in an action to support a child born out of wedlock and one born in wedlock.

The so-called limitations in the Act, to which the majority alludes, reinforces, in my view, the contention that the Legislature intended the statute to apply at least to the situation here presented. In one broad class of cases the use of blood grouping tests was being frustrated in Pennsylvania, and was not in accord with the modern nation-wide trend; that was in cases where it was alleged that the defendant was the father of a child, and in which he was unable to adduce concededly admissible and relevant evidence because of a refusal by the mother to submit several drops of her blood for a blood grouping test. The General Assembly, therefore, enacted a statute which would enable a defendant to procure blood grouping tests "to deter-

mine whether or not the defendant can be excluded as being the father of the child". There is no language in the statute which limits the applicability of the Act to bastardy proceedings alone (actions for support of a bastard and fornication and bastardy prosecutions). The Act does not read: "In bastardy proceedings . . ." or "In actions for support of a bastard or prosecutions for fornication and bastardy . . .". The Act reads: "In any proceeding . . .". It was the inability to require a mother to submit herself and her child to a blood grouping test when paternity was in issue, which the Legislature sought to remedy by enacting the Act of May 24, 1951, and it is to this end that the statute should be interpreted.

The Statutory Construction Act, 1937, May 28, P. L. 1019, clearly states that ". . . provisions of a law shall be liberally construed to effect their objects and to promote justice.", Art. IV, §58.

Though the Act of May 24, 1951 may be somewhat inartfully drawn, it is not difficult to give it the desired "liberal" construction.[13] Indeed the term "any proceeding" necessarily requires that the Act be given broad applicability.

Certainly the term "proceeding to establish paternity", upon which the majority places such emphasis, is at best of dubious meaning and ambiguous, especially in light of the fact that there is no proceeding in Pennsylvania so styled. As we pointed out above, there are

---

[13] The Statutory Construction Act is also clear in stating: "In no case should the punctuation of a law control or affect the intention of the Legislature in the enactment thereof.", Art. IV, §53. Although it is not necessary to this view, it may be noted that juxtaposing the comma would make the proviso read: "In any proceeding, to establish paternity the court, on motion of the defendant, shall order the mother . . .". Such punctuation would give the intended full play to the word "any".

proceedings for support, will contests, etc., in which paternity is a pertinent issue, but none to "establish" paternity. While at one time "legitimation proceedings" were not unknown, they have not been in use in this jurisdiction in the last century at least. Under these circumstances, the Statutory Construction Act is again instructive, Art. IV, §51: "When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law.".

The enactment of the statute at bar was "occasioned" by the recognition of the validity and usefulness of blood grouping tests in proceedings where paternity was in issue; it was enacted under "circumstances" which would tend to emphasize an intention for broad applicability of the statute, since the enactment reflects a nation-wide acceptance of the reliability of such tests, and the law tends to favor the use of the most reliable evidence available; it sought to remedy the "mischief" of a defendant's inability to obtain evidence which might prove beyond question his nonliability in certain suits; the "object" of the statute was to provide the courts with reliable evidence so that a man might not unjustly be made to support a child he had not fathered; the "former law" favored the admissibility of blood grouping tests in a variety of cases (where the child was born in wedlock, as well as without), but although procedures were available for securing the necessary blood samples in other cases, the two

Superior Court decisions referred to earlier had held the courts powerless to compel submission to blood grouping tests in paternity suits, and had, in effect, invited legislative action; the "consequences" of the interpretation which the majority gives to this statute would make blood grouping tests unavailable to a class of defendants, although the results of such tests, concededly admissible, would unquestionably negative the possibility of paternity, and the law is clear that where paternity is adequately negatived by competent evidence, a purported father is under no obligation to support a child; "contemporaneous legislative history" would reveal that the legislatures and courts of numerous American jurisdictions had, prior to 1951, or have since, enacted statutes making these tests available to the group in the position of the defendant who here seeks such relief; and "interpretations" of similar laws in other States have all tended toward greater use of blood grouping tests.

The undisputed facts in the case at bar illustrate better than any hypothetical case the manifest unfairness of the result reached by the majority. Robert J. and Adele O'Brien were married on October 24, 1938, and a daughter, Barbara, was born to them on June 25, 1939. In 1942 the husband and wife separated and have since lived apart. In 1946 a support order was entered against the husband for support of his wife and the daughter, Barbara. On February 11, 1947, five years after the husband and wife began living apart, a boy, Richard was born to Adele O'Brien. Three years later, on February 27, 1950, Adele and Robert O'Brien were divorced, and on March 6, 1950, the support order was modified so as to exclude the now-divorced wife and to increase the support for the daughter, Barbara. No mention was made in this order of the boy, Richard, although he was three years old at the time. Similarly,

pending the divorce action, the wife filed a petition for alimony pendente lite in which she noted that ". . . the defendant is endeavoring to support herself and their minor daughter, but said sum is grossly inadequate for that purpose."—no mention was made of the boy, Richard. Indeed it was not until October 28, 1954, four years after her divorce, seven and a half years after Richard was born, and twelve years after Adele stopped living with Robert J. O'Brien, that Adele O'Brien first moved to make the appellant, Robert J. O'Brien, liable for the support of the boy. The inference is inescapable that neither relatrix nor the appellant had hitherto considered Richard to be the son of Robert J. O'Brien. It was during the hearing in February, 1955 on this petition to include a then eight-year old boy in a support order for the first time, that the appellant moved that a blood grouping test be taken. It appears patent that this appellant is trying to do just that which the law, in my opinion, allows him to do, namely, gather what evidence he can to enable him to escape liability for support of a child he believes he has not fathered.

The facts raise one further question: What possible reason is there for not requiring relatrix to submit to the blood grouping test here in question? If the defendant is in fact the father of the child, or in the class of those who could be the father of the child, the results of the tests are inadmissible and of no effect. If the defendant is excluded by the test results, then the cause of justice has been advanced through the aid of modern science. No possible harm can come to the relatrix mother if indeed her claim is well founded.

Because the result reached by the majority to my mind disregards the clear intent of the Legislature, raises presumption to the status of fact and denies a defendant the use of indisputable scientific proof, I am constrained to register my dissent.

576

Mr. Chief Justice JONES and Mr. Justice JONES join in this dissent.