**Metzger v. Day**

*George Price,* for petitioner.
*Janice Yaw,* for respondent.

SMITH, *J.,* January 25, 1993—

OPINION AND ORDER

This is a dispute over whether or not blood tests can be ordered to determine the paternity of Jabe Adam Walters. Alan C. Metzger filed a petition to establish paternity on March 5, 1992 and a subsequent complaint requesting partial custody on April 10, 1992. The court issued an order directing blood tests on April 23, 1992, but vacated it when respondent raised the defense that the child was born to a common law marriage, and therefore it was improper to order blood tests. On June 22, 1992, respondent filed a motion for declaratory judgment of common law marriage. Hearing on this motion was held on November 9, 1992.

The initial issue before the court, then, is whether or not Joan M. Day and Leroy Walters were married by common law on January 1, 1991, as they claim. If the court finds that there is not a valid common law marriage, there is no question that blood tests should be permitted. If the court finds that there is indeed a valid common law marriage, it must then go on to decide whether or not it is proper to order blood tests to determine paternity.

FACTS [1]

Respondent, Joan M. Day, was romantically involved with both Alan Metzger and Leroy Walters at the time

---

1. Because this opinion was written without a transcript, no citations to the notes of testimony are given.

of Jabe's conception. She claims that since 1982, Mr. Walters had been essentially living with her at her R.D. 1, Williamsport home, although he owned his own house at Spook Hollow. Mr. Metzger claims that he and Ms. Day started dating and engaging in sexual intercourse late in 1987. While it is unclear exactly how long the relationship between Mr. Metzger and Ms. Day continued, Ms. Day did admit having sexual intercourse with Mr. Metzger at least during the period between September 13, 1990 to about October 11, 1990. Although this was probably before the period of Jabe's conception, the court finds that her testimony in this regard is not entirely credible, and that there is a very real possibility that Mr. Metzger is Jabe's father.

In early September 1990, Mr. Metzger took Ms. Day to dinner, proposed marriage to her, and gave her a ring. She accepted the ring and the proposal, and the two of them went together to have the ring fitted. Mr. Metzger claims that she continued to wear that ring in 1991—after the date of the alleged common law marriage. Ms. Day asserts that she returned it to him in November 1990.

Mr. Metzger testified that Ms. Day learned that she was pregnant in November 1990, and told him she did not know who the father was; Ms. Day claims she did not learn that she was pregnant until December 4, 1990, after she had reunited with Mr. Walters; Mr. Walters testified that he believed she found out about the pregnancy in November 1990.

Ms. Day and Mr. Walters assert that on January 1, 1991 they declared they were married, and agreed to live together as husband and wife from then on.[2] Several

---

2. Ms. Day did not actually move from her R.D. 1 address to Mr. Walters' house until March 1991.

witnesses testified in support of this allegation: Ms. Day's brother Ronald Keiser testified that prior to February 1, 1991, she told him that she and Mr. Walters would be living together at his house, and showed him a ring that Mr. Walters had bought her; her other brother, Verl Keiser, testified that sometime after New Years, she told him that they were going to be husband and wife; her friend Rochelle Stalings testified that on New Year's Day, she was at Ms. Day's house for dinner, along with Mr. Walters, and the couple told her that they were going to live together as man and wife, for the baby's sake; Janet Fletcher, another of Ms. Day's friends, stated that Ms. Day had called to tell her that she and Mr. Walters had gotten married.

Both Mr. Walters and Ms. Day testified that they did not marry in the traditional manner because they did not feel it was necessary, and because they did not want to go through the bother. Their surprising understanding of the legal issues of a common law marriage apparently came from a friend's experience.

During the period between the alleged marriage and Jabe's birth, on August 10, 1991, Mr. Metzger and Ms. Day saw each other on several occasions. Mr. Metzger claims that they had sex a couple of times, although Ms. Day denies this allegation. In any case, it appears that Mr. Metzger maintained an interest in the child throughout the pregnancy. He went to the physician's office with Ms. Day on at least one occasion. She apparently kept him informed during this period, doing such things as sharing the sonogram picture with him. Mr. Metzger had telephone conversations with her while she was at the hospital after Jabe's birth, and visited her and Jabe when she returned home. At that time, he urged her to take a blood test to help determine who the father was. Several weeks after Jabe's

birth he went to a park with Ms. Day and the baby, where he held and fed Jabe.

Ms. Day claims that the contact with Mr. Metzger after the alleged marriage mainly consisted of Mr. Metzger following her, and appearing when she went places. He apparently still had strong feelings for her, and seems to have also cared about the child. Ms. Day testified that he continued to try to see her and the child even when she told him she no longer wanted to see him. Throughout this period, he continued to insist that the child was his. On March 5, 1992, he filed the petition to establish paternity.

Ms. Day and Mr. Walters appear to have a solid relationship, and to have provided Jabe with a good home. They are expecting another child in May of 1993.

## DISCUSSION

### I. *Common Law Marriage*

Under Pennsylvania law, marriage is a civil contract, and no specific words are required to create it. All that is necessary is "proof of an agreement to enter into the legal relationship of marriage at the present time." *Estate of Gavula,* 490 Pa. 535, 540, 417 A.2d 168, 171 (1980). Generally, there is a valid marriage if there is sufficient evidence presented to prove that it was the parties' explicit intention to enter into a marriage relationship. *In re Estate of Stauffer,* 315 Pa. Super. 591, 462 A.2d 750 (1983). Although a rebuttable presumption is created by constant cohabitation and a general reputation as husband and wife in the community, this presumption will not arise where the parties have lived together unmarried up to the time of the alleged agreement. *Stevenson's Estate,* 272 Pa. 291, 297, 116 A. 162, 164 (1922); *In re Cummings Estate,* 330 Pa.

Super. 255, 479 A.2d 537 (1984). In such cases—and the instant matter is one—the claimant who asserts the existence of a marriage bears the burden of proving by clear and convincing evidence that a change in the meretricious status occurred, and that both parties consented to enter into a valid marriage. *Id.* Common law marriages may be created by uttering words *in praesenti* with the intent of establishing the relationship of husband and wife.

In the instant case, Ms. Day and Mr. Walters both testified that on January 1, 1991, they declared themselves married and agreed to live together as husband and wife for the rest of their lives. The testimony of Rochelle Stalings, who stated that she was present when Ms. Day and Mr. Walters told her they were going to live together as man and wife, provides additional evidence, as does the testimony of Janet Fletcher, who stated that Ms. Day called her and said that she and Mr. Walters had gotten married.

Mr. Metzger has presented no convincing evidence in rebuttal of this testimony. He merely stated that Ms. Day never told him that she was married, and that she continued to wear his ring. Neither one of these assertions, nor both together, successfully rebut the clear and convincing evidence which has been presented that the marriage took place. Thus the court finds that Ms. Day and Mr. Walters did indeed enter into a valid common law marriage on January 1, 1991.

## II. *Ordering of Blood Tests*

The important question, then, becomes whether or not the court may order blood tests in a situation where a child is conceived outside of marriage, but born inside marriage. The statute governing the ordering of blood

tests is the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S. §5104(c), which states,

"In any matter subject to this section *in which paternity, parentage or identity of a child is a relevant fact,* the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests." (emphasis added)

Thus the Act sets forth a threshold requirement that paternity be a "relevant fact" before tests may be ordered. In order for paternity to be a relevant fact, it may not be automatically determined by estoppel or by the presumption that a child born to a married woman is the child of her husband. *Christianson v. Ely,* 390 Pa. Super. 398, 405, 568 A.2d 961, 964 (1990). ("When a parent is estopped from denying paternity and the presumption of legitimacy has not been rebutted, paternity is not a relevant fact.")

Since the principle of estoppel does not apply to Mr. Metzger,[3] the question becomes a simple one: whether or not paternity has been established by the presumption that a child born to a married woman is the child of the marriage. If the presumption does apply, the court would clearly be prevented from ordering blood testing. As the Pennsylvania Supreme Court explains in *John M. v. Paula T. and Michael T.,* 524 Pa. 306, 571 A.2d 1380 (1990),

"This presumption (which we will henceforth refer to as the presumption that a child born to a married

---

3. It is interesting to note that Mr. Walters would be estopped from denying paternity under this statute, since he has held Jabe out to be his own since the child's birth.

woman was the child of that marriage) could traditionally be overcome only by proof that the husband did not have access to his wife during the period of possible conception, or by proof of the husband's impotency or sterility. See *e.g., Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 2342-43, 105 L.Ed.2d 91 (1989); *Commonwealth ex rel. O'Brien v. O'Brien, supra* [390 Pa. 551, 136 A.2d 451 (1957)]; *Cairgle v. American Radiator Standard Sanitary Corp., supra* [366 Pa. 249, 77 A.2d 439 (1951)]; *Burston v. Dodson,* 257 Pa. Super. 1, 390 A.2d 216 (1978)." *Id.* at 313-314, 571 A.2d at 1384.

Clearly, Mr. Metzger has not presented any evidence whatsoever that Mr. Walters is incapable of producing a child or that he did not have access to Ms. Day.

Ms. Day asserts that the presumption clearly applies in her case because Jabe was born after she was married; Mr. Metzger asserts that because Jabe was conceived prior to the marriage, it should not apply.

A review of the case law indicates that this question has not yet been addressed by the Pennsylvania appellate courts. Moreover, because the courts have been somewhat imprecise in their articulation of this presumption, one can find numerous statements which support both positions. Following are a few examples:

"The presumption that a child *born to a married woman* is a child of the marriage, and therefore of the woman's husband, is one of the strongest presumptions known to the common law." *McCue v. McCue,* 413 Pa. Super. 71, 75, 604 A.2d 738, 739-40 (1992). (emphasis added) [The child in this case was conceived while the mother was married.]

"The presumption that a child *conceived by and born to a married woman* is the child of the mother's husband is one of the strongest presumptions in our law." *Selm*

*v. Elliott,* 411 Pa. Super. 602, 605, 602 A.2d 358, 359 (1992). (emphasis added)

"This presumption (which we will henceforth refer to as the presumption that a child *born to a married woman* was the child of that marriage)...." *John M., supra,* at 313, 571 A.2d at 1384. (emphasis added) [The child in this case was conceived while the mother was married.]

"The presumption that a child *conceived and born during a marriage* is a child of the mother's husband is one of the strongest presumptions in the law." *Jones v. Trojak,* 402 Pa. Super. 61, 66, 586 A.2d 397, 399 (1990). (emphasis added)

*"Faust,* however, may not be extended to hold that when the family was intact *during conception and/or birth,* followed by a separation or divorce, the mere fact of separation or divorce having destroyed the unity of the family permits one or the other parent, for that reason alone, to request a blood test in aid of rebuttal of the presumption of legitimacy." *McCue, supra,* at 78, 604 A.2d at 741, quoting *Faust v. Faggart,* 406 Pa. Super. 357, 594 A.2d 660 (1991). (emphasis added)

At first glance, it would seem that these differing statements of the presumption are contradictory. However, because in the instances where the court refers to a child "born to a married woman" the child was also conceived within a marriage, this court suggests that the difference is merely the result of imprecise language; what the courts meant to say was that a child born and conceived within a marriage is presumed to be the child of the husband.

In order to determine whether or not this is the correct interpretation of the statements regarding the presumption, it is necessary to examine the policies behind the presumption and decide whether or not they would bring

about the intended results when applied to the instant case. The policies behind the presumption are: (1) to justly balance the interests of the mother's husband and the interests of the man asserting paternity, (2) to protect the marital institution, (3) to protect the interests of the Commonwealth in the family unit, and (4) to protect the interests of the child.

### A. Competing Interests of Mr. Walters and Mr. Metzger

The presumption that a child born into a marriage is the child of that marriage, applied to this factual situation, would result in giving more weight to the interests of the mother's husband than the interests of the man asserting paternity. Determining whether or not this is the proper result requires careful examination of the consequences.

Both Mr. Walters and Mr. Metzger desire to be Jabe's legal father. Should the court order blood tests which prove that Mr. Metzger is the biological parent, this would certainly mean a disruption to the family unit to which Mr. Walters belongs, and would create an unwelcome obstacle to—or at least imposition on—his relationship with Jabe for the rest of his life. On the other hand, if the court refuses to grant blood tests, Mr. Metzger will never have the opportunity to establish a relationship with the child whom he clearly believes is his own.

Ms. Day correctly asserts that Mr. Metzger is currently an outsider, in that he is not a member of the family into which Jabe was born. But perhaps that is not the relevant issue when weighing the competing interests of the two men; rather, the relevant issue is whether he was an outsider *at the time of Jabe's conception.*

If Jabe had been conceived within the marriage, the court would not hesitate to accord Mr. Metzger's interests less weight, because he would have been an outsider who came into an already existing marriage and family. An individual who deliberately disrupts the most important unit of our society should not expect the legal system to support his interests if a child is conceived as a result of his actions.

But since Ms. Day was not married at the time, Mr. Metzger was not intruding on a marriage or a family. In fact, he asked Ms. Day to marry him in September 1990, which was before the child was conceived, and she accepted, although she later changed her mind. Thus it seems highly unjust to brand Mr. Metzger as an intruder at the time of Jabe's conception—rather, he was merely having sexual relations with the woman he was engaged to marry! To cut him off from the child conceived in that relationship simply because his fiancee broke off the engagement and married another man unjustly deprives him of fundamental rights. An unmarried pregnant woman should not have the right to effectively terminate the rights that accrue to a natural father upon the birth of a child simply by marrying another man prior to the birth. In short, a woman should not be allowed to determine paternity by the man she marries.

The court finds no legitimate reason why Mr. Walters' interest in Jabe should be given more weight than Mr. Metzger's. Thus adopting the presumption would lead to an unjust result with regard to the competing interests of these two men.

### B. Protecting the Marital Institution

Clearly, the presumption that a child born into a marriage is the child of that marriage is also meant to

protect the marital institution. Its effect would be to prevent evidence of adultery from being obtained, which would certainly cause a strain on the marriage. One need only consider the exceptions permitted by the courts in order to understand the policy behind them: the presumption could be rebutted upon evidence that the husband did not have access to the wife or when he is impotent or sterile. Clearly, when these exceptions exist, it would be obvious to all involved that the wife had committed adultery—one would not need blood tests to prove it. Thus strictly applying the presumption in that case would not help preserve the marriage at all.

The question for this court to decide, then, is whether or not applying the presumption in a case such as the one at bar would help protect the marital institution. Again, if Mr. Walters and Ms. Day had been married at the time of Jabe's conception, there would be no question that it would. However, because the child was conceived outside of that marriage in this case, even if blood tests proved that Mr. Metzger was the father, this would not necessarily disrupt the marriage. After all, Ms. Day has already admitted having sexual relations with Mr. Metzger, and was even engaged to him very shortly before she married Mr. Walters. It is difficult to see how the results of the blood tests would harm the marriage at all. Perhaps one could argue that positive results from the tests would allow Mr. Metzger access to see his child, which would put him again into contact with Ms. Day, and might cause a strain on the marriage since it might rekindle some feelings in him or her. However, that is highly speculative, and to allow the existence of that possibility to outweigh a man's rights to his son would certainly constitute a gross injustice.

Lastly, the court notes that it may be true that at one time, allowing blood tests in this situation might

have harmed the marriage. The exposure of a wife's premarital sexual relations with another man might well have caused the husband shame and embarrassment sufficient to perhaps lose his commitment to the marriage. However, in today's world, sex before marriage—right or wrong—is so common that it is hard to imagine a situation in which its exposure would break up a marriage. And again, in most situations of this kind, where a child is born less than nine months after a marriage, it would already be obvious that the wife had engaged in premarital sexual intercourse. The only question would be whether or not the father of the child was her husband. Thus applying the presumption to this situation would not actually protect the marital institution.

## C. Protecting the Family Unit

Undoubtedly, the Commonwealth has a strong interest in preserving the family unit, and the presumption that a child born into a marriage is the child of that marriage helps to protect an intact family from assault by an outsider. This is explained in *John M., supra,* where a man who had an extramarital affair with the wife petitioned for blood tests to prove that he was the father of one of her children:

"There is, in short, a family involved here. A woman and a man who have married and lived together as husband and wife, giving birth to and raising four children, have obvious interests in protecting their family from the unwanted intrusions of outsiders (even ones who have had serious relationships with the mother, father or children). The Commonwealth recognizes and seeks to protect this basic and foundational unit of society, the family, by the presumption that a child born to a woman while she is married is a child of the marriage."

*John M., supra,* at 317-318, 571 A.2d at 1386. But the case of *John M.* differs from the instant case in one important way: the child in *John M.* was conceived and born inside a marriage. Moreover, there were already other children born to that marriage at the time the child in question was conceived.

Another important consideration is whether or not the family is still intact. See *Selm v. Elliott, supra; Faust v. Faggart, supra; Scott v. Mershon,* 394 Pa. Super. 411, 576 A.2d 67 (1990). If it is not, then the courts have indicated that such a family may not deserve the support of the state, since there is essentially no family to support.

In the case at bar, the important question which needs to be asked is whether or not the family of Ms. Day, Mr. Walters, Jabe Walters, and the child they are expecting should be protected, since it did not exist at the time of Jabe's conception. If the policy behind the presumption is, as articulated by the *John M.* court, to protect the family from outsiders, the issue again arises as to whether an outsider is defined as someone *currently* outside the family or someone who was an outsider *at the time of conception.* Obviously, Mr. Metzger is currently an outsider, and in initiating this legal action to claim rights to a child which he believes is his, he is attempting to disrupt the family unit that currently exists. But again, the court finds that it is unjust to conclude that the term "outsider" applies to someone such as Mr. Metzger, who was not intruding on an intact family unit when he had sexual relations with Ms. Day.

The court also notes that even if Mr. Metzger were to win visitation rights with Jabe, this does not mean that the existing family unit will not remain strong and continue to function. In these days of blended fami-

lies, it is unfortunately almost more common than not for children to live with stepparents and exercise visitation with their natural parents. Although the parent with primary custody does not always welcome this visitation, and although it undoubtedly sometimes causes difficulties within a family, a parent's right to visitation is nonetheless protected by the state.

Thus the court finds that the state's interest in preserving a family unit under the facts of this case does not outweigh a father's interest in his child. No mother should have the right to essentially cut a father off from his child and strip him of his parental rights by marrying another man before the child is born.

### D. Best Interests of the Child

Supposing for a moment that the court grants the blood tests and that the tests prove that Mr. Metzger is the father, it is tempting to say that it is in Jabe's best interest for him to remain unexposed to Mr. Metzger, and instead to grow up in an intact family, believing that Mr. Walters is his father and any other children born into the family are his natural sisters and brothers. On first blush, one might conclude that it would be in Jabe's best interest to protect him from the disruption brought on by the knowledge that his natural father is another man and to shield him from the stress of establishing and maintaining a relationship with his father in spite of the tensions that exist between the three adults. However, the court is not prepared to draw this conclusion.

A parent's love is a mystical thing, which cannot always be rationally explained, precisely measured, or accurately predicted. It is possible that, in spite of the undeniable inconveniences and disturbances which a relationship with Mr. Metzger might create, giving Jabe

the opportunity to know his natural father might turn out to be the nicest gift one could give him. It is entirely possible that a unique bond could form between Mr. Metzger and Jabe which becomes one of the most treasured relationships in Jabe's life.

There are other potential benefits, as well. For instance, Jabe and his parents would have access to accurate information regarding his father's medical history, as well as insights into certain characteristics or behavioral tendencies which might have been inherited. Also, he would have a sense of his true cultural background and heritage, which often becomes a meaningful element in one's life.

The appellate courts have given some insight on the issue of what is in the best interests of the child. They have carved an exception out of the presumption that a child born into a marriage is the child of that marriage by holding that the presumption could be rebutted upon evidence that the husband did not have access to the wife or when he is impotent or sterile. If a child conceived under these circumstances is given the right to know his or her natural father, a child conceived prior to marriage should be given no less of a right.

In balancing the competing factors, the court concludes that under the facts of this case, the best interests of the child are served by determining the identity of his natural father.

## CONCLUSION

The court finds that Ms. Day and Mr. Walters have produced clear and convincing evidence that they were united in marriage on January 1, 1991. Therefore, the court will grant the respondent's motion for a declaratory judgment of common law marriage.

Regarding the question of whether or not the presumption that a child born into a marriage is the child of a marriage applies to this case, this presumption was created to: allow for a just determination of the weight of the interests of the mother's husband and the interests of the man asserting paternity, protect the marital institution, protect the family unit, and protect the interests of the child. If the presumption were applied in the instant case, it would not achieve these results. First, it would result in an unjust determination that Mr. Walters' interests should be given more weight than Mr. Metzger's interests. Moreover, it would allow a pregnant woman to determine paternity by the man she married, and it would effectively terminate any rights that accrue to a natural father upon the birth of his child. Second, it would not actually protect the marital institution. Third, while it might protect a currently existing family unit, to do so at a natural father's expense would be unjust in a case where no family unit existed at the time of conception. Fourth, it would prevent the identity of the natural father from being determined—a result which is against the best interests of the child.

Therefore, since applying the presumption in this case would not bring about its intended results, and would actually cause injustices, the court finds that the presumption does not apply. Thus paternity is a relevant issue, and blood tests will be ordered.

## ORDER

And now, January 25, 1993, the respondent's motion for declaratory judgment is granted, and the court finds that Joan M. Day and Leroy Walters entered into a common law marriage on January 1, 1991.

As to Alan C. Metzger's petition to establish paternity, this motion is granted, and it is ordered that Alan C. Metzger, Joan M. Day, and Jabe Adam Walters all submit to a blood test for the purpose of determining paternity.

The testing shall be coordinated through the domestic relations office, and all costs shall be paid by Alan C. Metzger.

## JUDGMENT

On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the Court of Common Pleas of Lycoming County be, and the same is hereby affirmed.