[Page v. Dennison.]

# Page *versus* Dennison.

Grant.
1g 377
190　41

By the court, per Mr. Justice KNOX.

1. If a child is begotten while its mother is a married woman, its legitimacy is presumed, until the contrary is clearly made to appear.

2. The presumption of legitimacy of a child can be removed by showing that the husband had no sexual intercourse with his wife at any time when it was possible for the child to have been begotten.

3. Ante-nuptial conception does not weaken the presumption of legitimacy arising from a post-nuptial birth.

4. A child born in wedlock, though born within a month or a day after marriage, is legitimate by presumption of law, and this can only be rebutted by clearly proving that no sexual intercourse occurred between the two at any time when the child could have been begotten.

5. Where a child is born during wedlock, of which the mother was visibly pregnant, at the time of the marriage, it is presumed *juris et de jure* that it is the offspring of the husband.

6. Whether the child is begotten in or out of wedlock, if marriage precedes the birth, the presumption of paternity is the same, and it can only be bastardized by proof of non-access.

7. The wife is not a competent witness to prove non-access on the part of her husband, and that her child begotten before, but born during wedlock, was not begotten by him.

8. Non-access cannot be proved either by the husband or the wife, whether the action be civil or criminal, or whether the proceeding is one of settlement or bastardy, or to recover property claimed as heir-at-law.

9. For the purpose of establishing the illegitimacy of a child where no evidence of non-access at the time of conception was given, it is not competent to prove the declarations made by the husband at the time of its birth, that the child was not his, or of the mother that it was begotten by R., and that on the account of its alleged illegitimacy it was reared by its grandfather.

10. The modern rule is, that, where the evidence plainly shows such non-access on the part of the husband that he could not, in the course of nature, have been the father of the child, it is sufficient to establish its illegitimacy.

By Mr. Justice LOWRIE, dissenting.

1. In an inheritance case, where the claimant was begotten before and born after marriage, the mother is a competent witness to prove that her deceased husband, whose estate is the subject of the claim, was not the father of the claimant.

2. Where a child was begotten before and born after marriage, and at the time of its birth both the mother and her husband denied that it was his child, and it was within a few days sent away from his house and reared by its maternal grandfather, and never admitted into the family of the husband, nor reputed as his child, this is evidence in an inheritance case that the child is illegitimate.

3. Presumption on the subject of legitimacy examined historically and on principle.

ERROR to the Court of Common Pleas of *Fayette county*.

The plaintiff in error was defendant below.

Samuel Page and Mary Shank were married in April, 1817, and in July following, the wife gave birth to Mary, now wife of William Dennison, the present defendant in error. Samuel Page disclaimed being the father of the child, at the time of its birth, and in a few days it was removed to its grandfather's, and reared by him, and was never recognized by Page as his child. Samuel

and Mary Page had other children. Subsequent to the decease of Samuel, these other children commenced proceedings in the Orphans' Court of Fayette county, for a partition of his real estate. Mary Dennison was not included in the proceedings, and asked the court to be made a party to the proceedings. This the plaintiffs' in error objected to, and gave for reason that she was not the legitimate child of Samuel Page, and the Orphans' Court sent this issue to the Common Pleas, to determine whether the said Mary Dennison was the legitimate child and heir-at-law of the said Samuel Page. On the trial of this issue, the plaintiff in error offered to prove, by Mary Page, widow of Samuel Page, and mother of Mary Dennison, that she, the said Mary Dennison, was begotten by a man by the name of Rist, before her marriage with Samuel Page, and born about three months after said marriage, and that her deceased husband, Samuel Page, was not the father of said Mary Dennison. To this testimony defendant in error objected, and the court, GILMORE, P., sustained the objection, and overruled the evidence; which is the error complained of here, and raises the only point in the case.

*Kaine*, for plaintiff in error, referred to 2 Greenleaf's Ev. 126, sec. 151; *King* v. *Luff*, 8 East, 103; 1 Greenleaf's Ev. sec. 344; *Commonwealth* v. *Shepherd*, 6 Bin. 283; Phil. Ev. 113; 2 Kent's Com. 211, 212; *Stetgall* v. *Stetgall*, 2 Brockenbrough, R. 269; Peake's Cases, 32; *Rex* v. *Bramley*, 6 T. R. 330; *Bowles* v. *Bingham*, 2 Munford; S. C. 3 Id. 399; 1 Black. Com. 454; Co. Lit. 244, a. Thomas' Coke, 509: Bishop on Div. 199; 2 Str. 940; 1 Salk. 123; *Platt* v. *Powles*, 2 Maule & Sel. 65; 3 P. Wms. 275, 276; 1 Roll. Abr. 338; 5 Ad. & Ellis, 180; 1 Ad. & E., N. C. 444; 10 Law Jour. 97; 4 T. R. 251, 216; 4 Bro. R. 90; Com. Dig. tit. Bastard, A. B.; 1 Simons & Stuart, 150; S. C., 1 Turner & Russell, 138; *Cope* v. *Cope*, 1 Moody & Robinson, 269, 274; *Goodright* v. *Moss*, 2 Cowp. 591; *Banbury Peerage case*, 2 Bac. Abr., Bouvier, 82, 1st ed.; Shelford's Marriage and Div. 707, 723; 4 Petersdorf's Abr. 170; 3 Paige, 139; 1 Ash. 269; 2 Mylne & Keene, 349; 2 Brock. R. 256; 6 Binn. 286; Nichol's Law of Adulterine Bastards.

*Ewing* and *Davidson*, for defendant in error, referred to *Rex* v. *Luffe*, 8 East, 207; 2 Stark. Ev. 218; 2 Kent, 5th ed. 211, 212, note (b); *Lomax* v. *Holmden*, 2 Str. 940; *Stetgall* v. *Stetgall*, 2 Brock. 257; *Bowles* v. *Bingham*, 2 Munf. 442; 3 Id. 599; *Mrs. Gaines's case*, 6 How. 589; 3 Stark. Ev. 1121; *Rex* v. *Reading*, Cas. temp. Hard, 79; *Rex* v. *Book*, 1 Wils. 340; Sayer, 61; 1 Greenleaf, Ev. § 344; *Commonwealth* v. *Shepherd*, 6 Bin. 291; *Rex* v. *Kea*, 11 East, 132; 2 Green. Ev. § 151; *Banbury Peerage case*, 2 Bac. Abr., Bouvier, 82, 1st ed.; *Pen-*

*drell* v. *Pendrell*, 2 Str. 925 ; Hargrave and Butler's notes to Co. Lit. lib. 3, ch. 6, tit. Descents, note 181.

The opinion of the court was delivered February 14, 1857, by KNOX, J., and will be found in 5 Casey's Reports, 420.

Mr. Justice LOWRIE dissented, and delivered the following opinion.

LOWRIE, J.—We have only one rule of positive law applicable to this case, and that is, that lawful children shall be heirs of their parents. In case of dispute, it is the duty of the courts to investigate and decide who are the lawful children ; and this is our present question. The law gives us no positive rules for deciding it, and therefore it is our duty to look to reason and experience for direction, and to receive in evidence all such facts as naturally tend to cast light upon the subject, and to admit as witnesses, all persons who are able to communicate such facts, unless experience excludes them as unreliable.

But are we indeed striving to ascertain who are the real children of Samuel Page, or only to ascertain and follow some old examples and maxims that would fix upon him an arbitrary and fictitious paternity ? If the former is our purpose, then we are endeavoring to execute the law of inheritence, given to us by our superiors, the legislative power. If the latter is our purpose, then it seems to me that we are endeavoring to sustain, as positive law, the judicial glosses upon the law of inheritence, and partially to set aside the law which we are appointed to administer, by the false process which we adopt of arriving at the truth.

Here it is worth while to look a little into the history of jurisprudence on this branch of human relations: for, without this, we may fall, on one hand, into an ignorant and slavish formalism, or, on the other, into unintelligible and reckless innovation. With it, we may profit by the experience of our predecessors, and avoid the errors which, to them, were inevitable. Without it, we are mere adventurers and pretended discoverers, repeating to the injury of others, the very errors which the experience of the past ought to teach us to avoid. If we desire to sum up and be properly guided by the history of this particular point in jurisprudence, we must study to understand that history.

There certainly was a time in the progress of English jurisprudence, when the courts paid very little regard to the fact of paternity, and satisfied themselves with the facts of marriage and *maternity* in questions of heirship ; and thus adopted the rule, that *he who marries a woman must father all the children afterwards born of her*. This rule has all the definiteness of positive law, and has the merit, at least, of being easily understood and

[Page *v.* Dennison.]

applied. And as all positive law is received in barbarous times, according to the letter, and without the qualifications and distinctions of more refined periods; so it seems very natural to find that this rule was often applied, in ancient jurisprudence, with a strictness that is shocking to our modern notions. It was the adoption of the maxim by which a title to slaves and cattle is sometimes tried, *partus sequitur ventrem;* and it was put into plain Saxon in *John Flettesham's case,* 7 H. 4, 9, b, "who bulleth my cow the calf is mine." Possibly it was received with favor, because the ruling race found in it a mode of ascertaining the line of succession in their tenants, and their other rights of lordship which was much more easily understood than any legitimate process of arriving at the real truth. It could hardly be expected to fit comfortably when applied to themselves, and it is said that parliament was, in many special instances, called upon to correct its injustice, and did so. And perhaps its simplicity had much to do with the answer of the barons, *quod nolumus leges Angliæ mutare,* when the bishops proposed to introduce the canon law on this subject. 20 H. 3, c. 9. Certainly the answer proves no dislike of the Roman civil law: for that was not in question, and all the English law books written about that period, Bracton, Glanville, and Britton Fleta, exhibit for it a special fondness.

But this rule was the result of an abandonment or very defective performance of the judicial duty of investigation, and the substitution of an arbitrary rule, which proclaimed that there was no sympathy between the government and its subjects. But it could not stand, for this sympathy does exist; public justice demanded the truth on the subject of *paternity,* and gradually exceptions to this rule of evidence were allowed; first, when the husband was incompetent, and afterwards, if he was beyond sea during all the period of his wife's gestation. This was some advance towards allowing the truth to decide the question. But it was very limited; for it was of no avail if the husband was so unfortunate as to return home even a week before the birth. Salk. 122, 284.

And it was the very spirit of this limitation that decided the paternity, if a man married a woman already *enceinte* by another, and where a woman eloped from her husband and lived in adultery with another man, or was married to him. Bro. Ab. Bastardy, 4, 8, 26. All these are samples of an ancient jurisprudence, that are now everywhere called absurd. But, absurd as they are, we are in danger of allowing their influence to be felt, even in a more advanced state of society and jurisprudence, and of permitting ourselves to be guided by the opinions of judges who lived and spoke at a time when these decisions had not ceased to influence the legal mind; for a system generally retains the dregs

of an error, long after it has been discovered and condemned. Always, where judges have seriously undertaken to decide such cases according to the real truth, they have broken through, the rule, and have sometimes succeeded in establishing exceptions to it, until at last it has almost entirely faded away; and it is by this sort of continual attrition, that nature always operates in wearing away whatever is anomalous and obstructive of systematic harmony.

And it is worthy of notice, that these decisions never had an absolute sway, for their flagrant injustice would necessarily prevent an entirely unbending application of them; and we find cases wherein a wife's elopement and living in adultery; 40 Ed. 3, 16; 43 Ed. 3, 19, b; 39 Ed. 3, 14; 11 Ed. 4, 174; Lib. Ass. 33, 8; Bro. Ab. Bastardy, 21; and where the fact that the child was begotten by a stranger before marriage; 18 H. 6, 31, b; 44 Ed. 3, 12, b; 45 Ed. 3, 28; were allowed their proper influence.

Let any one trace the development of jurisprudence on this subject, and he will discover that 'the original definition of a legitimate child has undergone an entire change. The definition, leaving out the case of posthumous children, was, one born in lawful wedlock. Put this into another form, and it is plainly this: *one whose mother was, at the time of its birth, a married woman.* Paternity is not at all regarded. But exceptions were gradually admitted, that paid some little respect to the husband. He was not to be charged with the child, if he was physically incompetent, or if he was beyond sea during the whole period of gestation; then if he was beyond sea at the time of conception; 8 East, 193; then if he was living at such a distance from his wife as to make all intercourse improbable; and, at last, if he was living separate from her, under such circumstances of distance or alienation, as rendered intercourse improbable. At last then, the right of the husband is fully admitted, as an element in the question of legitimacy; and the definition of a legitimate child now stands, *one whose parents were intermarried before it was born.* And this change in the definition is here and there recognized in our law books; Salk. 484; 8 East, 204, 211; Shelf. on Mar. & Div. 706, 707; 2 Stephen's Com. 314.

But the old definition still stands in almost all our modern law books, and it was followed to the letter, and perhaps in its original spirit, when it was decided that the husband was chargable with an ante-nuptial generation, whether his or not, because its mother was his wife when it was born.

The pernicious influence of the old exploded rules is further seen in the idea very commonly attached to the maxim, *pater est quem nuptiæ demonstrant,* which is often used as if it meant the nuptials demonstrate the paternity; yet this is right in the face

[Page *v*. Dennison.]

of that other maxim, *qui ex damnato coitu nascuntur, inter liberos non computantur*. Certainly it was formerly read as being equivalent to *partus sequitur ventrem;* but so soon as the husband's rights began to be regarded, it began to obtain its true meaning, and in modern days all learned men treat it as equivalent to *pater a nuptiis præsumitur*. I say this is its true meaning, and always was. Bracton treats it as a mere presumption, and says that it stands until the contrary is proved. It is derived from the Roman law, and no one will pretend that, there, it had any other meaning; and the canonists used it in the same sense. And here I may add, that all the true and valuable principles of our old law on this subject, were derived by our old writers from the Roman Pandects, and all the more modern principles are there likewise. I may add, also, that not one of the exploded principles of our jurisprudence ever existed in the Pandects, and I do not find that any of them ever existed in any part of Europe where the Roman law was adopted.

The presumptive character of the maxim, *pater est*, &c., is presented in the Roman law with direct bearing on this case, for there it is held that a child, born within six months after the marriage, or over forty weeks after its dissolution, is presumed to be illegitimate until the contrary is proved. This is founded purely on physiological principles or natural laws, and Hippocrates is appealed to for them. And it was on these principles that the case of *Alsop* v. *Bowtrell*, Cro. Jac. 541, was tried; for there the birth was forty weeks and nine days after the husband's sudden death, and, on the evidence of matrons and physicians, the child was declared legitimate. This is the rule also in France and Germany.

This child was begotten before and born after marriage, and we have no other evidence of the paternity than the marriage. Is this evidence by itself of that fact? It has been shown that the old definition fixes the paternity by the nuptials, without regard to truth or evidence. Then there are cases and dicta which assume that there ought to be evidence, and which assert the principle, that where the condition of the woman is known, it is adopted by the act of marriage; (8 East, 208, 210, 212; 2 Brockenb. 269; 2 Munf. 442; 3 Id. 602; 13 Iredell, 502;) but these are, possibly, only some of the dregs of the old rule, and there are no English or Pennsylvania cases since the abandonment of the old absurdities, that affirm the question. It is therefore open for discussion and decision, on pure rational principles.

We must take the question in its simplest form : is marriage evidence of the paternity in a case of ante-nuptial generation? for thus the case is presented to us. Being begotten before marriage, certainly, until the marriage, there is no presumption of the paternity of the yet unborn child. As a fact, the marriage

[Page *v.* Dennison.]

does not account for anything existing before it; but if we knew the paternity, we might account for the marriage. Out of a thousand neighbors, the law, until the marriage, could fasten its suspicion or presumption upon none. It therefore presumed the innocence of every man, and pronounced its *prima facie* sentence, that Samuel Page was not the father. And, as our question excludes his knowledge of the woman's condition, of course it forbids us from treating the marriage as his admission of any share in producing that condition. If the mother had sworn the child to the true father, and then married another man before the birth, I suppose the marriage would not have been evidence that her prior oath was perjurious; yet if it proves one paternity and the marriage another, there is a flat contradiction.

If, notwithstanding all this, we still declare that the marriage proves the ante-nuptial paternity, we disregard the natural laws on which presumptions are founded, and raise mere arbitrary and fictitious ones, that do not profess to declare the truth; but only to declare that, under given circumstances, the relation of parent and child shall be taken to exist, though all natural presumptions say that it does not in fact exist. If this is not judicial legislation, then I do not understand the term. If marriage fixes the paternity of an unborn child, because the husband is presumed to admit it, much more ought it to fix the paternity of a whole brood of bastards, already born and living with their mother at the time of their marriage; but nobody would venture to say this. The canon law did not presume the paternity in such a case, though it legitimated the children, if the paternity was admitted or proved to be in conformity with the subsequent nuptials.

The presumption of the paternity from the nuptials alone, is a falling back upon the very principles of the old, absurd, and abandoned decisions; and we might as well say that gestation might be complete in three months or three weeks; for, when we abandon natural presumptions and go to fictions, we are simply disregarding truth; and then the more plainly false they are, the less liable are they to mislead, by being supposed to be intended for truth. Such a fiction would have the generous merit of presuming an unnaturally prompt gestation, rather than impute incontinence to the woman.

We add a new element to the question, when we assume that the husband knew the wife's condition when he married her. But a marriage, even under such circumstances, has no direct tendency to prove paternity. Indirectly, it does tend to prove it; for marriage with such knowledge, suggests at once to the mind, man's instinctive aversion to female infidelity, and, by the aid of this additional element, forces him to believe, if nothing appears to the contrary, that the marriage is an acknowledgment of pater-

[Page *v*. Dennison.]

nity. But such a conclusion is plainly one of fact and not of law, and can be drawn only by the jury, and not by the court.

As, however, these elements do not belong to our case, and we cannot presume, from the nuptials themselves, that they accord with the parentage, we must necessarily look for facts, arising after the marriage, that may cast light upon the question. And certainly we should have some natural and rational grounds of deciding it, if we found that, after the child's birth, the husband treated it as his own; or, if we do not discover any of those facts which would ordinarily be expected to arise on the development of a spurious progeny. Strip the case of these, and let it appear, as it does here, that the husband embraced the first decent opportunity of disowning the child; that his paternity was then denied by both him and his wife; that the child was sent away from his house, and reared, as illegitimate, by its maternal grandfather; and then we have nothing left but the marriage, as a ground for the presumption of paternity; and that has already been shown to be insufficient, even when there are no facts pointing to a contrary presumption.

These conclusions do not depend, for their proof, entirely upon deductions drawn from the principles of human nature. If they did, I would mistrust them. They have a very large experience in their favor. In Scotland and on the continent of Europe, the paternity of a child, begotten before marriage, is not presumed from the nuptials alone: but from the nuptials and other circumstances preceding and follow them. The Roman law presumes bastardy, if a child be born within six months after marriage, until the contrary is shown; because a child of less than six months' gestation is not usually born alive; and this law has undergone a European experience of more than a thousand years, without alteration or dispute; while our old arbitrary judicial rule could never be steadily administered, because of its disregard of justice, and has at last been given up in all cases, if it is not still retained as the rule of ante-nuptial generations.

I have already said, that, as a general test of paternity, it never reigned with an unfaltering sway, and that now its arbitrary character is abandoned, and it is admitted, in the true sense of *pater est quem nuptiæ demonstrant*, as the expression of a presumption, deriving its measure and authority from pure principles of natural law. An ante-nuptial case is given in the Year Book, 44 Ed. 3, 12, b, wherein evidence was admitted that another than the husband was the father of the child, without any other ground laid for it, except that the husband was confined to his bed by sickness, from the time of his marriage until his death. *Foxcroft's Case*, as understood by Lord Ellenborough, 8 East, 200, 205, is even stronger than this, and goes the whole length of the principles I am contending for; for therein a birth, twelve weeks after

[Page v. Dennison.]

marriage, was condemned on the ground that the husband was an infirm, bed-ridden man, when he was married. Lord Ellenborough's explanation of the case may be erroneous; but still it is valuable, as indicating his opinion of the law.

But why do we presume legitimacy in any case? Mathew says the presumption "rests simply on the supposition of the virtuous conduct of the mother; a branch of that equitable rule that assumes the innocence of a party, until proof be brought of actual guilt." Pres. Evid. 22; 7 Humph. 410. If this is a correct grounding of the rule, then, of course, there can be no presumption of legitimacy, arising out of marriage merely, in such a case as this; for the birth proves that the wife was not innocent. But the rule operates positively the other way, and presumes bastardy; because it presumes the innocence of him who became the husband. From his lawful act of marriage, there can be no legal presumption of any prior unlawful act committed by him.

The leaning in favor of innocence is carried so far as to presume the death of a former husband, if he was not heard of for a year before his wife's second marriage. 2 B. & Ald. 386; 4 Cush. 49. And in a case of divorce *a mensa et thoro*, though the parties remain husband and wife, still, being separated only "until they shall be reconciled to each other," and intercourse is not unlawful; yet a child begotten during the separation, is presumed a bastard, because the husband is presumed to have obeyed the law of the separation. Salk. 123. *A fortiori* then, is the presumption valid that ante-nuptial conception does not proceed from the husband, because such a presumption involves a charge of guilt. Even opportunity proved is not a ground for such a presumption.

Let us take the old definition of a legitimate child: born in marriage, or in a competent time after; either will answer. But suppose a birth falls within both categories; within a competent time after the death of a former husband, and after marriage with another. Mr. Justice Bereford rescued the case from its dilemma quite logically, by saying that the child might choose which should be its father: and he has been quoted ever since, though no case of paternity seems to have ever been decided in that way; and Brooke rejects the saying, when transmitting it to us, "*quod non est lex, ut videtur.*"

But why was it logical? Simply because it was a legitimate issue of false premises, or of an arbitrary rule that disregarded the truth. The old rule admitted a portion of truth, when it admitted the competent time after the termination of the marriage, as an element in the question of legitimacy; but it rejected the correlative portion, when it refused to consider the competent time after the commencement of the marriage relation.

But the time being ascertained, here are two conclusive and contradictory presumptions of law, giving to the child two fathers.

Yet nature rejects this result: how shall we avoid it? By Bere-ford's rule. If we will not hear the truth, we must have an arbi-trary and complete substitute for it. .We wonder that, in assigning an umpire for this dilemma, he did not think of one who knew more about the case. But Bereford's rule was too absurd, and nature broke over it; and it always does in the end, break over the strongest fortifications of error; for it always speaks the truth and demands it.

Naturam expellas furca: tamen usque recurret,
Et mala perrumpet furtim fastidia victrix.

Nature demands an inquiry into the very truth, in the case of too early, as well as of posthumous births, and a decision accord-ing to natural presumptions and probabilities. And so, in *Thecar's case*, Litt. R. 177; Co. Litt. 123, b, note, it was after a trial by jury on the facts, that the child was declared Thecar's son; the first and not the second husband's.

But this claimant never was acknowledged nor reputed to be the daughter of Samuel Page: is this a proper element to aid in testing the legitimacy of a child ante-nuptially begotten?

It was substantially such evidence that was allowed to prevail in cases where the wife was living separate from her husband and in adultery. 5 Clarke & F. 163; 4 T. R. 256, 356; 20 Ala. 548. And Lord Mansfield says, Cowp. 594: "suppose from the hour of a child's birth to the death of its parent it has always been treated as illegitimate.; that would be good evidence." And Fleta, 1, 15, 4, and Bracton, 2, 29, 5, attribute the same value to the act of disowning and sending away a child from the house. And surely it must be so, when reputation is sufficient evidence of parentage, even when the parents are living. 4 Bing. 266.

Such repudiation of a child seems to me very strong evidence of bastardy, regarding it according to the ordinary manifestations of human feeling; for no man, who believes himself to be the father, could thus ruthlessly and perseveringly sever the ties of blood, and no mother could submit to such a severance, and to the abiding indignity involved in it, unless it was just. If the charge were untrue, she would leave her unworthy husband and cleave unto her child. I think the evidence ought to have been ad-mitted.

But we have still another question to dispose of. Is the mother a competent witness to prove that a child, begotten before mar-riage and born after it, is not her husband's?

I know that it has been said that public policy excludes the mother in bastardy and pauper cases, from being a witness to bastardize her children, by proving the non-access of her hus-band. 11 East, 132; 6 Bin. 291; 5 Ad. & E. 180. But what

idea is this term, public policy, intended to express ? I understand it as a general term, expressive of the principles upon which certain persons are excluded as witnesses. If this is not so, then it is to me an undefined and transcendental term, and I cannot consent to use it as a screen for my ignorance. That is a bungling analysis that ends in undefined results, and I cannot admit that this term, public policy, is a mere receptacle of the sediment of the analytic process. I receive it as a term expressive of all the reasons which the law admits as available against the competency of evidence or witnesses, if we allow it to go beyond those reasons that reject evidence that is violative of confidential relations. It never excludes relevant truth on account of its indecency ; else it might at once declare that no causes should be tried that involve questions of immorality.

I admit that in bastardy and pauper cases, when the mother is a married woman, she is not competent, without a *prima facie* case having been first made out, that she has had no intercourse with her husband that would account for the birth. I say a *prima facie* case, because that is all that is made out by proof that the husband and wife were living apart in the same country, and within visiting distance, which was the proved non-access of many of the cases. 6 Binney, 283 ; Stra. 51 ; 1 Queen's B. R. 444 ; 1 Brown's R. (Appendix) 47. How does this make her competent ? Because it will justify the jury in finding that the husband is not the father, and therefore is not interested. Some cases say that she must not be the *only* witness of non-access, (1 Wils. 340 ; 8 East, 202, 211 ; Hardw. Cas. 77 ; 6 Binney, 288, 291 ;) and this involves the same idea. If her husband's interest is apparently removed, she may testify to the paternity,—which she could not do without adding expressly or impliedly that she had had no intercourse with her husband about the time of the conception.

I know that Lord Mansfield is reported, Cowp. 594, as having said that " it is a rule, founded in decency, morality and policy, that they (husband and wife) shall not be permitted to say after marriage *that* they have had no connection, and therefore that the offspring is spurious." But he was speaking of post-nuptial intercourse, and the word *that* is misplaced. He might truly say so in that sense, and not in relation to ante-nuptial intercourse : for surely it is eminently moral and decent to deny criminal connection, and for either to acquit the other of it ; and if they were charged with it, the law would, in an action of slander, presume it untrue. And when the wife is rendered competent by the apparent non-access of her husband, no ideas of decency are allowed to exclude her from testifying to her own adulterous connection with a stranger.

To suppose that it is a regard for decency that excludes so close

[Page *v.* Dennison.]

an investigation of the truth, is to overlook the whole spirit of our legislation and jurisprudence on this subject. To allow the few dollars that are involved in a bastardy case to be a sufficient reason for demanding the truth, even from the mother; and yet to shut it out in inheritance cases, which usually involve much greater amounts, and which, by the very reason of moral refinement, have a most intense moral interest, would be taking a very low and materialistic view of the demands of justice in such cases. To refuse, on grounds of decency, to allow the wife to testify of her husband's absence, and yet to compel her to testify that she has had criminal intercourse with another man, is surely very absurd. To say that necessity demands the testimony of the wife when the State wants to know who shall support a bastard; and that it is otherwise when the State wants to know how to divide an inheritance, is surely to talk without thinking. And to suppose that the mother is not admitted until the child's bastardy has been otherwise proved, is to overlook some things already said, and also the fact that cohabitation and reputation are *prima facie* evidence of marriage and of consequent legitimacy; and yet, in inheritance and pauper cases, the parents are competent to disprove the apparent marriage, and thus to show illegitimacy. Cowp. 591; 2 Phil. Ev. 287; 3 Pick. 293.

Lord Kenyon says, 6 T. R. 331, "if the parents may be called to prove that the children are legitimate, there is no reason why they should be considered incompetent to prove that they are illegitimate." Other cases show, that the mother may be a witness as to the legitimacy of her children. 2 Stra. 925. Hardw. Cases, 74. And when to all this we add, what we find in all the books of evidence, that reputation of marriage and parentage, of legitimacy and illegitimacy; the declarations of parents about their children; their treatment of them, and their family records, are evidence of inheritance; how can we, with any systematic consistency, say that the parents are incompetent witnesses of these facts?

Legal evidence is the means of arriving at truth in juridical controversies, and it depends so completely upon natural principles, and it is naturally so much modified by the constant changes and developments of the social life, that no people, I believe, has ever attempted to reduce its rules into a system of positive law. It is only when courts have set up bad ones as positive law, that the legislative power has been compelled to interfere and institute others more natural. In this case, it seems to me, we are converting an unnatural rule of evidence into a rule of positive law, for we are rejecting a witness that naturally knows best the fact under investigation, and evidence that would tend to demonstrate it. This is imposing a dead and arbitrary law, where we ought to have a living and natural one. It seems like

[Richards *v*. Richards.]

an effort to give new life to the fossil ideas of a worn out age. It is refusing to the law its proper character of being the expression of a living sympathy between the government and the people. Rightly expressing this sympathy, the law is right; otherwise it is not; "one touch of nature makes the whole world kin."

I have a very strong belief that the evidence offered in this case is of the very kind that is naturally the most convincing, and I think that its value would be properly tested by submitting it to a jury. I do not believe that any jury would hesitate upon it to pronounce this claimant a bastard; and the more pure and intelligent the jury, the more certain would be this result.

I have now performed my duty in relation to this case; I have done it sincerely, earnestly and carefully; but my brethren have come to a different result. And I am sure that they have considered it as earnestly, and carefully and sincerely as I have done. I most sincerely hope that they are right; for, if they are, they have declared the very justice of this case; and have saved us from conclusions that might operate very unjustly in time to come. I cannot see as they do, and yet I freely admit, that with their opinions against me, the probabilities must be that I am wrong. I would reverse the judgment on both points.