**[J-58-2024] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| STEVEN M. SITLER, | : | No. 37 MAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 1402 MDA |
| | : | 2023, entered on March 5, 2024, |
| v. | : | Affirming the Order of the |
| | : | Columbia/Montour County Court of |
| | : | Common Pleas, Civil Division, at No. |
| ALEXAS JONES, | : | 2023-MV-22-MV entered on |
| | : | September 11, 2023 |
| Appellee | : | |
| | : | SUBMITTED: July 31, 2024 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE DONOHUE**                                        **DECIDED: April 25, 2025**

I agree with the Majority's decision to overrule decades of this Court's jurisprudence that made the presumption of paternity irrebuttable in the context of an intact marriage. However, I dissent from its perpetuation of this Court's steadfast refusal to accept the policy decision of the General Assembly that the presumption of paternity is rebuttable by scientific evidence. I would follow the direction of our Legislature and, when and if appropriate, instruct the trial court to conduct genetic testing on Sitler and the child. If the genetic testing establishes that Sitler is the biological father, his standing in the custody matter that he commenced is established. The custody court must then determine, based on the best interests of the child, whether Sitler will enjoy custody or visitation rights.

Instead, the Majority continues to legislate by devising a multifactor test to determine whether genetic testing will be permitted to rebut the presumption based on

some notion that this Court should be in the business of hiding the truth about genetic parentage. In doing so, the Majority conflates establishing genetic paternity with the right to custody or visitation. I cannot join this opinion. Over sixty years ago, in the Uniform Act on Blood Tests to Determine Paternity ("Uniform Act on Blood Tests"),[1] the General Assembly announced its intention that scientific testing shall be available to litigants in civil and criminal matters to establish paternity. The General Assembly established absolutely that the result of scientific testing overcomes the presumption of paternity. 42 Pa.C.S. § 5104 (c), (g). The time is long overdue that we abide by the will of the Legislature on this policy choice and abandon our arrogant adherence to the common law of this Court.

Historically, the law presumed that a child born to a married woman is the child of the woman and her husband. *Dennison v. Page*, 29 Pa. 420, 422 (1857) ("A child born in wedlock, though born within a month or a day after marriage, is legitimate by presumption of law," and "this presumption can only be rebutted by clearly proving that no sexual intercourse occurred between the two at any time when the child could have been begotten."). It is a concept originally tied to coverture, the notion that "once a woman married, her legal existence disappeared[,]"[2] with one Justice crassly comparing it to the "plain Saxon[,] … 'who bulleth my cow the calf is mine.'" *Page v. Dennison*, 1 Grant 377 (Pa. 1856) at 380 (Lowrie, J., dissenting).[3] The presumption was formerly referred to as the "presumption of legitimacy," and was thought of as "a tremendously strong

---

[1] Act of July 13, 1961, P.L. 587, No. 286, §§ 1-9, recodified and adopted as 23 Pa.C.S. § 5104.

[2] *Allegheny Reproductive Health Center v. DHS*, 309 A.3d 808, 870 (Pa. 2024) (internal citation omitted).

[3] *See also Brinkley v. King*, 701 A.2d 176, 185 (Pa. 1997) (Newman, J., concurring and dissenting) (expressing the view that "the presumption that a child born during **coverture** is a child of the marriage has lost its place in modern society") (emphasis added).

presumption that children are legitimate[,]" which could be overcome "only by proof of facts establishing non-access or that the husband was impotent or had no sexual intercourse with his wife at any time when it was possible in the course of nature for the child to have been begotten." *Cairgle v. Am. Radiator & Standard Sanitary Corp.*, 77 A.2d 439, 442 (Pa. 1951) (internal citations omitted). Underlying the legal fiction were two rationales: shielding children from the stigma attached to illegitimacy and "the preservation of the marriage and the family unit." *B.C. v. C.P.*, 310 A.3d 721, 730 (Pa. 2024) (collecting cases). This Court opined in 1957 that "[t]his presumption is essential in any society in which the family is the fundamental unit." *Commonwealth ex rel. O'Brien v. O'Brien*, 136 A.2d 451, 453 (Pa. 1957).

In 1978, the General Assembly announced that "all children shall be legitimate," and thus marked a significant departure from the legal disadvantages that previously attached to being born "out of wedlock." Act of November 26, 1978, P.L. 1216, Section 1; *see* 23 Pa.C.S. § 5102. Once the General Assembly eliminated the "illegitimacy" designation, this Court avoided using the term "legitimacy" as well. This logic carried over into consideration of the presumption of legitimacy, and in 1990, the Court stated that the "phrase 'presumption of legitimacy' is now meaningless." *John M. v. Paula T.*, 571 A.2d 1380, 1383 n.2 (Pa. 1990). Though the Court deemed the phrase meaningless, it retained the principle underlying the presumption of legitimacy and rebranded it. As then-Justice Saylor explained in *Strauser v. Stahr,* 726 A.2d 1052, 1054 n.1 (Pa. 1999), this Court now refers to the "presumption that a child born to a married woman is a child of the marriage" as the presumption of **paternity**. *Id*. (citing *John M.*, 571 A.2d at 1383 n.2); *see also B.C.*, 310 A.3d at 730.

As early as 1951, the General Assembly established statutory authority for a trial court to order blood tests to determine paternity. Act of May 24, 1951, P.L. 402, § 1. The

provision applied to "proceeding[s] to establish paternity," authorized courts to order "blood grouping tests by a duly qualified physician[,]" and provided for the admissibility of the test results "but only in cases where definite exclusion of the defendant is established." *Id*. This Court read the provision narrowly to allow requests for testing from defendant-husbands seeking to raise defenses of non-paternity to charges for "fornication and bastardy" or "actions for neglect to support a bastard." *O'Brien*, 136 A.2d at 452-53 (stating that the provision applies only to proceedings "brought to **establish** paternity"). It did not, the Court explained in the *O'Brien* case in 1957, apply to the action for support of a child born during wedlock because "paternity has already been established in the eyes of the law by operation of the presumption of the legitimacy of children born during wedlock." *Id.* at 453. The Court justified the narrow reading of the authority to order "blood grouping tests" on the language of the provision, which it contrasted with the "Uniform Act on [B]lood [T]ests to [D]etermine [P]aternity" (which had not yet been adopted in Pennsylvania) and was viewed as having much greater breadth. *Id*.

In 1961, the General Assembly adopted the Uniform Act on Blood Tests,[4] thus eliminating the *O'Brien* Court's rationale for treating the legislative command as a narrow one. It applies to actions where "paternity, parentage or identity of a child is a relevant fact," and it authorizes the court to order the "mother, child and alleged father to submit to blood tests." *Id*. The Uniform Act on Blood Tests was recodified in its same form as part of the Judiciary Act of 1976,[5] then again recodified and consolidated in 1990 as 23 Pa.C.S. § 5104, and provides:

---

[4] Act of July 13, 1961, P.L. 587, No. 286, §§ 1-9.

[5] Act of July 9, 1976, P.L. 586, No. 142, § 2, as amended 28 P.S. §§ 6131-6137.

## § 5104.  Blood tests to determine paternity

**(a)  Short title of section.--**This section shall be known and may be cited as the Uniform Act on Blood Tests to Determine Paternity.

**(b)  Scope of section.--**

**(1) Civil matters.--**This section shall apply to all civil matters.

* * *

**(c)  Authority for test**.--In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

**(d)  Selection of experts.--**The tests shall be made by experts qualified as examiners of blood types, who shall be appointed by the court.  The experts shall be called by the court as witnesses to testify to their findings and shall be subject to cross-examination by the parties.  Any party or person at whose suggestion the tests have been ordered may demand that other experts qualified as examiners of blood types perform independent tests under order of court, the results of which may be offered in evidence.  The number and qualifications of experts shall be determined by the court.

**(e)  Compensation of experts.--**The compensation of each expert witness appointed by the court shall be fixed at a reasonable amount. It shall be paid as the court shall order. Subject to general rules, the court may order that it be paid by the parties in such proportions and at such times as it shall prescribe or that the proportion of any party be paid by the county and that, after payment by the parties or the county, or both, all or part or none of it be taxed as costs in the action. Subject to general rules, the fee of an expert witness called by a party but not appointed by the court shall be paid by the party calling him, but shall not be taxed as costs in the action.

**(f) Effect of test results.--**If the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests are that the alleged father is not the father of the child, the question of paternity, parentage or identity of a child shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.

**(g) Effect on presumption of legitimacy.[6]--**The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.

23 Pa.C.S. § 5104.

The Majority recognizes the Uniform Act on Blood Tests, but finds that case law and science require the Court to continue to disregard not only its text but also the express public policy stated in it that scientific testing trumps the presumption of paternity.

Historically, our case law virtually ignored the saliency of the Uniform Act on Blood Tests. It is ironic that the Majority finds no problem in overruling decades of precedent in order to reach its framework for rebutting the presumption of paternity in an intact

---

[6] Technical "phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). The "presumption of legitimacy" is a technical phrase that was given a peculiar and appropriate meaning over time. At the time this statute was first enacted in 1961, the presumption of legitimacy was that a child born to a married woman was a child of the spouse of the mother. *Cairgle*, 77 A.2d at 442; *see also John M.*, 571 A.2d at 1383 n.2 (referring to it as presumption that "a child born to a married woman is a child of the marriage"). As described, supra pp. 3-4, following the legislative announcement that no child shall be illegitimate, in 1978 the Court determined that the phrase "presumption of legitimacy" was rendered meaningless, *John M.*, 571 A.2d at 1383 n.2, and rebranded it as the presumption of paternity. Although this Court was free to re-name the presumption, whether it is called a presumption of legitimacy or a presumption of paternity, as used in Section 5104(g), it clearly relates to the presumption that a child born in wedlock is the child of the mother's husband. That is the presumption that is rebutted by definitive scientific blood testing. According to Section 5104, the question of whether the presumption of paternity is rebutted is answered by the results of the scientific tests.

marriage,[7] but finds itself bound to the deeply flawed case law that arrogantly disregards an act of the Legislature establishing the method to rebut the presumption of paternity. A brief review of this problematic jurisprudence makes the case for this Court to abrogate it and finally follow the lead of our legislative branch.

In continuing to disregard the clear statutory command, the Majority states that *John M.* "rendered the Uniform Act on Blood Tests substantially irrelevant[,]" Majority Op. at 9 n.36, as if it is legitimate for this Court to do so. In *John M.*, this Court addressed the Uniform Act on Blood Test's application to a case involving an assertion of the presumption of paternity. *John M.*, 571 A.2d 1380.[8] This Court acknowledged that the Uniform Act on Blood Tests had relaxed the presumption of paternity to the extent that it established that the presumption is overcome "if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child." *Id*. at 1385. The *John M*. majority confined its holding to the

---

[7] *John M.,* 571 A.2d 1380; *Strauser*, 726 A.2d 1052; *Jones*, 634 A.2d 201; *B.C.*, 310 A.3d 721.

[8] John, an asserted biological father, sought custody and visitation of a three-year-old child, when the child's mother suddenly restricted his access. Based on the mother's voluntary consent, Human Leukocyte Antigen ("HLA") blood testing was performed on the mother, the child, and the asserted biological father as provided in the Uniform Act on Blood Tests. *John M.*, 571 A.2d at 1382. Although by 1989 the Legislature was addressing paternity testing in terms of genetic testing, 23 Pa.C.S. § 4343, blood type testing including HLA testing was still prevalent. *Cable v. Anthou*, 699 A.2d 722, 723 (Pa. 1997) (addressing request for HLA testing and referring to testing by buccal swab as "relatively new"). The results of the HLA testing in *John M.* were inconclusive, and pursuant to the statute, the presumption that the mother's husband was the father of the child was not rebutted. John sought a court order to compel the husband (i.e., the presumptive father) to submit to blood testing, relying on Pa.R.C.P. 4010(a) regarding court orders for parties to submit to physical and mental examinations and the Uniform Act on Blood Tests. This Court held that John failed to establish "good cause" because he "had introduced no evidence that would come close to overcoming the presumption that the [child] was a child of the marriage under the traditional standards." *John M.*, 571 A.2d at 1383.

"precise issue raised by the parties"[9] and held that the Uniform Act on Blood Tests could not allow John (the putative father) to compel the presumptive father to submit to blood tests because it only envisions ordering "'the mother, child **and alleged father** to submit to blood tests.'" *Id*. at 1385 (citing 42 Pa.C.S. § 6133 (1976) (repealed and reenacted as 23 Pa.C.S. § 5104 in 1990)) (emphasis in original).[10]

In open defiance of the mandate of the General Assembly in the Uniform Act on Blood Tests, Chief Justice Nix authored a concurring opinion garnering unanimous support to state, in dicta, that the presumption of paternity is absolute, "the statutory provision … notwithstanding." *John M*., 571 A.2d at 1389 (Nix, C.J., concurring). He stated that "[i]t would also follow that [John] is not entitled to **compel** either the mother or the child to undergo testing." *Id*. at 1389 n.1. The unanimous concurrence thereby announced in dicta that the legislative branch could not provide the mechanism to overrule the common law presumption, an astounding proposition of law, but one that we unfortunately continue to follow.

When the *John M.* Court subordinated the Uniform Act on Blood Tests to the common law presumption of paternity, Majority Op. at 8, it engaged in the type of judicial legislation that had been decried, over a century earlier, with regard to the presumption

---

[9] The *John M.* majority opinion starts with a caveat that the author "agrees with the views expressed" in Chief Justice Nix's Concurring Opinion, but that the Majority's holding "is confined to the precise issues raised by the parties[.]" *John M.*, 571 A.2d at 1381, at n.*.

[10] The Uniform Act on Blood Tests as codified in 42 Pa.C.S. §§ 6133-6137 was at issue in *John M.*, which was decided in 1990. In the same year, under the auspices of Judiciary Act Repealer Act, the Uniform Act on Blood Tests was recodified at 23 Pa.C.S. § 5104. The recodification contained minor grammatical and organizational changes. Its operative language remained the same. It is true that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. § 1922(4). The Legislature's recodification of the Uniform Act on Blood Tests in 1990, though it technically occurred after the *John M.* opinion was announced, was not a "subsequent statute on the same subject matter." It was the same statute, repositioned without the General Assembly's reconsideration of its content.

of paternity.  *Page*, 1 Grant at 383 (Lowrie, J., dissenting) (criticizing the Majority's interpretation of the presumption by stating, "If this is not judicial legislation, then I do not understand the term").  The ongoing modern legislation from the bench is more troubling than that of a century ago given the brazenness of applying the presumption of paternity as a threshold question notwithstanding the Uniform Act on Blood Tests which expresses a clear policy in favor of the rebuttal of the presumption by way of scientific testing.

Based on *John M.*, this Court eradicated the trial court's statutory authority to order blood tests as established in the Uniform Act on Blood Tests in order to rebut the presumption of paternity.  Despite the clear language of the statute, over the past thirty-five years, this Court has read into the Uniform Act on Blood Tests two threshold determinations:  a "court may order blood tests to determine paternity only when the presumption of paternity has been overcome[,]" and "[o]nly when the doctrine of estoppel does not apply[.]"  *Jones v. Trojak*, 634 A.2d 201, 206 (Pa. 1993) (citing *John M.*, 571 A.2d at 1380);[11] *see also Strauser*, 726 A.2d at 1054 (holding that because the alleged biological father could not overcome the presumption of paternity, blood tests establishing a 99.9% probability of the paternity for the alleged biological father were irrelevant).  In *Strauser*, Justice Newman (joined by Justice Castille) dissented to express the view that the Majority's rejection of blood testing conflicts with the clear and express language of

---

[11]  In *Jones*, without even mentioning the Uniform Act on Blood Tests, this Court addressed an appeal relating to the admissibility of blood test results, which the trial court had ordered to address a mother's claim for support. The mother sought support from the asserted biological father (Trojak), and he raised the presumption of paternity to argue that the mother's ex-husband was the presumptive father of the child.  Trojak also argued that the mother was estopped from seeking support from him because she and her ex-husband had held the ex-husband out as the father.  On appeal, this Court decided that the presumption of paternity must be rebutted before the trial court may order blood tests. There, the mother rebutted the presumption of paternity on the facts by showing that the marriage vows had been repudiated, and estoppel did not apply because the ex-husband/presumptive father did not accept the child as his own.  *Jones*, 634 A.2d at 206-07.  Therefore, the blood tests were necessary to resolve the child support claim.

the Uniform Act on Blood Tests providing that a court may compel blood testing and that the testing can rebut the presumption of paternity. *Strauser*, 726 A.2d at 1058 (Newman, J., dissenting). In response, the Majority retorted:

> In her dissenting opinion, Madame Justice Newman discerns a conflict between this holding and the Uniform Act on Blood Tests to Determine Paternity, now codified at 23 Pa.C.S. § 5104, which she views as codifying the public policy that blood testing may always be employed to rebut the presumption of paternity. Such position, however, has never commanded a majority of this Court. *See John M.,* 571 A.2d at 1385 (stating that "section 6133 of the Act [now 23 Pa.C.S. § 5104(c)] does not give the putative father the **right** to compel a presumptive father (husband) to submit to blood tests"); *see also John M.,* 571 A.2d at 1389 (Nix, C.J., concurring, and joined by all others) (declaring that "a third party who stands outside the marital relationship should not be allowed, for any purpose, to challenge the husband's claim of parentage").

*Id*. at 1056 n.2. While this is a true statement of the position of the Court, the explanation does nothing more than clarify that this Court has refused to follow the dictates of the statute that not only makes the presumption rebuttable, but also provides the mechanism for the rebuttal by way of blood tests.

The Uniform Act on Blood Tests obviated the need for this Court to struggle to determine when and how the presumption of paternity is rebutted. The structure of the provision illustrates the General Assembly's intention for courts to order testing, then to consider the effect of the results on the presumption of paternity. The General Assembly issued a clear command to use scientific testing to rebut the presumption of paternity. This Court has persistently ignored the mandate.

With regard to science, the Majority justifies disregarding the legislative mandate because Section 5104 "has not been amended to reflect scientific advances in genetic testing." Majority Op. at 8 & n.33 (citing *B.C.*, 310 A.3d 739-40 (Wecht, J., concurring)).

In *B.C.*, the same author indicated that "the current statute … is hopelessly outdated[]" because the statutory language commands court ordered blood tests and appointment of "experts qualified as examiners of blood types[.]" *B.C.*, 310 A.3d at 739 (citing 23 Pa.C.S. § 5104(d)). Justice Wecht opined that this was not "the most efficient scientific method for determining paternity." *Id.* Likewise, today, the Majority writes that the Uniform Act on Blood Tests "has not been amended to account for modern DNA testing" and cites to statutory language authorizing the court to order "**blood tests**[,]" Majority Op. at 9 n.37 (citing 23 Pa.C.S. § 5104(c) (emphasis added)), presumably contrasting the blood tests provided for under the Uniform Act on Blood Tests with DNA tests by buccal swabs. *See* Majority Op. at 14 (stating that DNA testing today is more accurate and "less intrusive than the blood tests of the 1980s"). The Majority also states its preference for genetic testing by buccal swab rather than by blood draw, but it does not explain how these considerations render obsolete the General Assembly's stated **policy** to use scientific testing to rebut the presumption of paternity.

The Majority is correct that the testing described in Section 5104 is not state of the art science for determining paternity. Blood type testing as is referred to in Section 5104(d) (referring to appointment of "experts qualified as examiners of blood types"), is no longer the most effective method to determine paternity. As explained by the Superior Court in *Reed v. Boozer*, 693 A.2d 233, 236 (Pa. Super. 1997), traditional blood type testing is less certain than DNA testing. *See also Stahli v. Wittman*, 603 A.2d 583, 585-86 (Pa. Super. 1992) (observing that genetic tests which specifically look at DNA "differ significantly from the blood cell antigen typing performed in the instant case[,]" and they have greater certainty than blood cell antigen tests). Generally, even advanced blood typing tests that include consideration of multiple inherited factors such as "ABO and R.H. factors, [and] M.N.S.," *Reed*, 693 A.2d at 238, are best used to exclude potential genetic

fathers whereas current marker-based methods of DNA analysis confirm the parental relationship with 99.99% accuracy.

Nonetheless, even if blood type testing as contained in Section 5104 does not reflect state of the art testing for paternity, the public policy espoused in Section 5104(g) is unambiguous. The General Assembly has not repealed Section 5104 or otherwise withdrawn its affirmative reliance on scientific testing to rebut the presumption of paternity. 23 Pa.C.S. § 5104(g). In light of this announced mandate that scientific testing rebuts the presumption of paternity, this Court does not have the authority to avoid scientific testing as the threshold mechanism to rebut the presumption. To effectuate the intention of the General Assembly, scientific testing must be used to rebut the presumption of paternity.

Today, scientific testing means marker-based methods of DNA analysis which can be accomplished through the use of buccal swabs. The Majority correctly concludes that the presumption of paternity should be rebuttable in the intact marriage scenario. In my view, instead of perpetuating the judicial preference for placing obstacles in the way of scientific proof of actual paternity, we are bound by the Legislature's statement of policy in the Uniform Act on Blood Tests to simply use science, i.e., genetic testing, to rebut the presumption.

Despite clear direction from the legislature, the Majority proceeds as if the Legislature has not spoken on the obstinate **judicial** preference for children being raised by married couples. Majority Op. at 19-20 ("In the absence of legislative action,[12] the presumption of paternity can protect the formation of families by married couples."). Instead of relying on genetic testing to rebut the presumption of paternity, the Majority

---

[12] What the Majority actually means is the absence of its preferred "comprehensive statutory scheme to govern paternity determinations." Majority Op at 6. Again, this is based upon the misplaced notion that the Legislature cannot decide that scientific proof of paternity is enough to rebut the presumption.

enacts the following test to rebut the presumption of paternity when an asserted biological father, such as Sitler, seeks genetic testing to establish his paternity of a child born in wedlock for purposes of seeking custody:

> In order to determine the paternity of a child born in wedlock, courts first must determine whether the marriage is intact at the time of the paternity challenge. If so, then the presumption of paternity applies, and dictates that, regardless of biology, the mother's spouse will be the child's parent. However, the presumption may be rebutted if the putative father produces clear and convincing evidence that: (1) there is a reasonable possibility that DNA testing would reveal him to be the child's biological father; and (2) determining parentage based upon DNA testing serves the best interests of the child, with due consideration for the interests of the potential father as well as the interests of the wife and husband. If the court finds no threshold possibility of paternity, or determines that adjudicating paternity by DNA testing would disserve the relevant interests, then the presumption governs. But if the court finds a threshold possibility of paternity, and determines that the balance of interests lies in assigning paternity based upon the biological truth, the presumption must yield, and the court should order appropriate genetic testing to determine paternity of the child.

Majority Op. at 25-26. The Majority therefore vacates and remands for further proceedings consistent with its newly announced framework. *Id*. at 26.

At its core, the Majority's approach conflates the determination of genetics with the determination of custody. A genetic parent of a child may not have a viable claim entitling him to custody or requiring support payments. *See Ferguson v. McKiernan*, 940 A.2d 1236 (Pa. 2007) (holding that the mother's contractual release of known sperm donor— genetic father—from responsibility for support was enforceable). And a non-genetic parent of a child may have custody rights. *Id*. In a heterosexual monogamous family structure, the genetic parents to a child are often the only two persons entitled to custody.

However, there are also family structures where genetic parents do not have such rights, and the parents, through adoption, surrogacy, or otherwise, are not the genetic parents.[13]

In sum, genetic testing may reveal the biological truth, but it does not necessarily control the legal rights of the parties. *See, e.g.*, *In re Papathanassiou*, 671 S.E.2d 572, 577 (N.C. Ct. App. 2009) (stating that the genetic testing and "legitimation of a child is a separate and distinct issue from who shall have custody and control of the child"). It would be misguided to focus on extreme situations where a determination of genetic parentage may seem detrimental.[14] As the North Carolina Court of Appeals explained, these concerns "can be, and properly are, addressed in other proceedings, such as custody, adoption or termination of parental rights, where the best interest of the child is paramount." *Id*.

---

[13] I cannot cling to the notion that it is the public policy of this Commonwealth that children's interests are necessarily served by "the stability of an intact family unit" led by married parents. Trial Court 1925(a) Opinion, 10/10/2023, at 1. I would emphasize that families regularly flourish under non-traditional configurations and that families regularly falter under traditional ones. Nowhere is it assured that a stable family unit, defined as one involving a married couple, will remain as such for any prescribed period of time let alone the entirety of a childhood. Ultimately, it is the legislative prerogative to identify and implement the Commonwealth's policy preference, especially in an arena as sensitive as marriage and child-rearing. The Legislature provided for no fault divorce, 23 Pa.C.S. § 3301(d), making severance of marriages relatively easy; it endorsed scientific testing to determine paternity allowing for the potential involvement of a third party in a married couple's family unit. As to the preferred structure of the family unit, the clearest statement of the Legislature is that in all cases, the best interests of the child must prevail in custody matters. 23 Pa.C.S. § 5328. Given the co-existence of the statutes that recognize expedient termination of marriages, the recognition of a third party's genetic paternity to a child born to a married couple and the dominance of the child's best interests in custody matters, I am hard pressed to find a legislative declaration that it is the clear public policy of the Commonwealth that marriages involving children must be preserved.

[14] For example, to conclude that a father who is a convicted murderer and in prison for life without parole should not be established as the biological father misses this point. He may never secure custody rights, but the fact of his biological parentage need not be concealed to attain this result.

That is not to say that there are not preliminary inquiries that a trial court must make prior to ordering genetic testing. Section 5104(c) of the Uniform Act on Blood Tests authorizes a court to order blood testing "upon motion of any party to the action made at a time so as not to delay the proceedings unduly." 23 Pa.C.S. § 5104(c). Because this Court steadfastly refused to follow the dictates of the statute, little case law has interpreted its language. However, in this appeal, the underlying proceeding was a custody matter and arguably, genetic testing would unduly delay its resolution if there was not a showing that Sitler had a credible basis to assert paternity. Likewise, there is no dispute that he acted diligently in commencing the custody action. Contrary conduct would interfere with established custody. Thus, the trial court should determine whether the individual seeking testing acted diligently in bringing the custody action and request for testing and whether the individual established a credible basis to assert paternity.

Finally, the Majority's test operates to subordinate parental rights of a biological parent—and in particular, the fundamental right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). The right "is among the oldest of fundamental rights." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). This right is often weighed against a "child's essential needs for a parent's care, protection, and support[]" in the context of an involuntary termination of parental rights proceeding. *Id*. In that context, we have observed that termination of parental rights "has far-reaching and intentionally irreversible consequences for the parent and the child." *Id*. It is of such gravity that the party seeking termination of parental rights must establish by clear and convincing evidence based on competent evidence "the existence of statutory grounds for doing so." *Id*.

Here, Sitler promptly filed a complaint for custody, and then a complaint for genetic testing, and he established a credible basis to assert biological parentage. Absent

scientific testing, the trial court indicated that it would not consider his claim for custody. In these circumstances, the denial of testing extinguishes Sitler's ability to assert his right to parent on the basis of a presumption that a husband must be the biological parent even in the face of contradictory evidence. It is a troubling proposition that courts can extinguish an asserted biological parent's chance at establishing his rights without the best evidence of his paternity, let alone evidence meeting the clear and convincing standard. While the Majority is correct that Sitler has not advanced an argument based on his potential constitutional right, this issue is patent on the fact of this case and others like it.

In my view, the Majority engages in a misguided effort to draft a legal framework to address requests for genetic testing from an asserted biological father of a child born to a married woman. Rather than legislating from the bench based on judicial policy preferences, we should be enforcing the legislatively announced public policy that scientific testing is the mechanism by which the presumption of paternity is rebutted as enshrined in the Uniform Act on Blood Tests, 42 Pa.C.S. § 5104. Absent the complication of this case as a result of the trial court's undisturbed finding that husband is the father by paternity by estoppel, I would vacate the order of the Superior Court and remand, instructing the trial court to order testing.

**Remand**

The trial court found that both the presumption of paternity and paternity by estoppel precluded testing in this case. The trial court concluded that paternity by estoppel applied because it was in the child's best interest to maintain the four-month bond between the husband and child.[15] Trial Court Pa.R.A.P. 1925 Opinion, 10/10/2023,

---

[15] Sitler brought the custody action when Child was eight days old and promptly filed the request for genetic testing thereafter. Sitler's Brief at 19. He credibly asserts that "at three … months of age, it is impossible to say that any such bond exists – that the [C]hild (continued…)

at 1. The Superior Court did not reach Sitler's challenge to the finding of preclusion of testing based on paternity by estoppel because it found that paternity by estoppel applies only when the presumption of paternity does not. Therefore, because Sitler failed to overcome the presumption of paternity, "paternity by estoppel [wa]s inapplicable here[.]" *Sitler v. Jones*, 312 A.3d 334, 340 n.5 (Pa. Super. 2024). We accepted review of the propriety of the Superior Court's failure to address the trial court's determination that paternity by estoppel precludes genetic testing here. *See Sitler v. Jones*, 318 A.3d 758 (Pa. 2024) (per curiam).

Our case law mandates that genetic testing will be performed if the presumption of paternity is rebutted **and** paternity by estoppel is inapplicable. *See Jones*, 634 A.2d at 206 ("Only when the doctrine of estoppel does not apply will the mother be permitted to proceed with a paternity claim against a putative father with the aid of a blood test"); *Freedman v. McCandless*, 654 A.2d 529, 532 (Pa. 1995) (same). The trial court found that paternity by estoppel applies. Under the law, this conclusion precludes genetic testing independently of any determination related to the presumption of paternity. Given that the trial court's undisturbed application of paternity by estoppel was an independent dispositive basis to deny genetic testing, any exercise by the trial court reconsidering the presumption of paternity, whether it is the multi-faceted test espoused by the Majority or

---

has formed a bond with [H]usband – and no evidence was elicited at the hearing to indicate such a bond. In fact, it is patently apparent that at the [C]hild's age, no such bond existed in this case." *Id*. at 20; *see similarly V.E. v. W.M.*, 54 A.3d 368, 371 (Pa. Super. 2012) (stating that, "as a matter of law, it is impossible for a four month old child to suffer any damaging trauma from the performance of genetic testing … as there has been an insufficient amount of time for any bonding to have occurred between any father and child") (internal citations omitted). Moreover, Sitler raises a colorable challenge to Mother's attempt to use paternity by estoppel as a sword to preempt him and the newborn Child from the possibility of discovering and establishing a relationship simply based on her marriage. *Id*. at 20-21.

my view of rebuttal based on genetic testing in keeping with the intent of the Legislature as expressed in the Uniform Act on Blood Tests, is premature.

Given the complication of this case as a result of the trial court's undisturbed finding of paternity by estoppel, I agree with the Majority that this case must be remanded to the Superior Court with instructions to address Sitler's challenge to the trial court's finding of paternity by estoppel. Any further proceedings in the trial court will have to bide the event of the resolution of the paternity by estoppel challenge.

For the foregoing reasons, I respectfully dissent.


Justice Mundy joins this concurring and dissenting opinion, with the exception of footnote 13.